BUSH et al. v. MERRILL et al.

(Court of Civil Appeals of Texas. Amarillo. March 22, 1913. On Motion for Rehearing, May 10, 1913.)

1. VENDOR AND PURCHASER (§ 75*)—CONTRACT OF SALE—CONSTRUCTION—PERFORMANCE—REASONABLE TIME.

Complainants contracted to sell city property to defendants, they to pay $8,000 cash, when complainants would give them exclusive charge of the property for resale, but required that they should not sell lots for less than $100 each, complainants to accept purchase-money lien obligations of lot purchasers as a credit on the price due from defendants. The contract did not bind defendants personally to pay the balance of the price nor fix a time for complete performance. Held, that defendants' sale of the lots was not a condition precedent to complainants' right to enforce the contract, but that defendants were bound to perform within a reasonable time, either by selling the lots or paying the balance of the price, and, not having done so within two years and three months, complainants were entitled to cancel.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 113–118, 126; Dec. Dig. § 75.*]

2. VENDOR AND PURCHASER (§ 98*)—CONTRACT—CONSTRUCTION—FORFEITURE.

Defendants purchased certain city property from complainants at a price higher than it was then worth, thinking that because of a boom they would be able to resell it at once at a profit. Defendants paid the $8,000 cash, the contract providing that the balance should be paid out of the proceeds of contracts for resale, complainants to accept certain terms with vendor's lien securities as payment of defendants' liability under the contract, but restricted defendants' right to sell for less than $100 a lot. The boom having collapsed, defendants were unable to sell the property for $100 a lot, notwithstanding they paid a large sum in advertising the property and endeavoring to do so. Held, that there was no equity arising out of such facts in defendants' favor requiring complainants to return the cash paid by defendants as a condition to the cancellation of the contract.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 163–165; Dec. Dig. § 98.*]

Error to District Court, Lubbock County; W. R. Spencer, Judge.

Trespass to try title by W. E. Merrill and others against W. T. Bush and others to cancel a contract for the sale of real property. Judgment for plaintiffs, and defendants bring error. Affirmed.

Stephens & Miller, of Ft. Worth, for plaintiffs in error. Bean & Klett, of Lubbock, and Cooper, Merrill & Lumpkin, of Amarillo, for defendants in error.

HENDRICKS, J. This was a controversy in the district court of Lubbock county, Tex., between the defendants in error (plaintiffs in the trial court), M. E. Merrill, J. C. Roberds, and F. C. Hudgins, and the plaintiffs in error (the defendants in the trial court), W. T. Bush, R. Harkrider, and the Western Realty Company. The Western Realty Company became a party defendant to this cause of action by virtue of an assignment to it by Bush and Harkrider of the contract, which in the main measures the rights of the parties, and out of which this controversy grew, and omitting certain descriptions of property, which are immaterial to the decision, is as follows:

"The State of Texas, County of Lubbock.

"This contract of bargain and sale made and entered into this the 15th day of July, A. D. 1909, by and between J. C. Roberds, M. E. Merrill and F. C. Hudgins, all of Lubbock county, Texas, hereinafter referred to as parties of the first part, and W. T. Bush, of Tarrant county, Texas, and R. Harkrider, of Howard county, Texas, hereinafter referred to as parties of the second part, witnesseth:

"(1) That the parties of the first part have this day sold and by these presents do hereby sell and obligate themselves to convey or cause to be conveyed in manner and time as hereinafter stated unto the said parties of the second part or their vendees all and singular the following described real es-

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes.

tate, situated in the county of Lubbock, in the state of Texas, to wit, All that certain tract or parcel of land known as the Merrill addition to the town of Lubbock, being out of the N. E. quarter of section No. 7, block B, surveyed for the T. T. Railroad Co. by virtue of certificate No. 307, as is shown by a map of the plan of said Merrill addition duly recorded in the deed records in the office of the county clerk of Lubbock county, Texas, in Book ――――, on page ――――, to which reference is hereby had for further and better description. It is expressly agreed and understood that all lots included in said Merrill addition as shown in said plat which have heretofore been sold, are not included in this contract. * * *.

"(2) The consideration paid and to be paid to said parties of the first part by said parties of the second part for the property above described and conveyed is the agreed sum of $43,945, as follows: $500 cash in hand paid, receipt of which is hereby acknowledged, and a further sum of $7,500 to be paid in cash on or before the 1st day of August, A. D. 1909, making total cash payment on said date $8,000 and leaving a balance of $35,945, which said balance is to be paid in manner and time as hereinafter stipulated.

"(3) It is mutually agreed and understood by and between the parties to this contract that the legal title to said above described property shall remain vested in the parties of the first part until the entire purchase money as above specified has been paid, and said first parties agree and bind themselves that, whenever said entire purchase money shall have been paid, they will immediately thereafter execute and deliver to the parties of the second part, their heirs and assigns, a good and sufficient warranty deed, conveying all of the above described property which had not at that time been previously conveyed under and by virtue of the terms of this contract.

"(4) It is further agreed and stipulated that parties of the second part shall be entitled to the immediate possession of all of said property conveyed by this contract upon payment of the said sum of $8,000, as hereinbefore provided, and that after the payment of said $8,000, said second parties shall be authorized and empowered to contract and sell the above described property, either as a whole or in single lots, or in any number of lots, at such price and on such terms as they may desire, and that in all cases where said second parties shall have sold said lots, or any number of them, singly or in bulk, parties of the first part will, on payment, execute and deliver to the buyer of such lot or lots, a good and sufficient general warranty deed, conveying same to him for the consideration agreed to be paid by them: Provided, however, that in no case shall such deed be executed and delivered where the amount of cash paid is less than one-fourth of the total consideration, and in all cases where deeds are demanded by parties of the second part, they shall turn over and deliver to parties of the first part the total consideration for which such sale or sales have been made, including all of the cash payment, which must not be less than one-fourth of the total purchase price and the purchase-money notes for balance, which said notes shall mature not later than eighteen months from and after the date of deed, and shall bear interest from date at the rate of 6 per cent. per annum, shall retain an express vendor's lien on the lot or lots conveyed, and shall be the usual and regular form of vendor's lien notes. In this connection, it is agreed, however, that said second parties shall be allowed to retain from the cash payment a sum not to exceed $10 for each lot sold to cover expense of making such sale, and it is further understood and agreed that said second parties shall not sell any of said lots for a less sum than $100 per lot, and it is further understood and agreed that all expense incident to the execution of such deed or deeds shall be paid for by parties of the second part. It is the intent and purpose of the above agreement that whenever a sale of lot or lots shall have been made by parties of the second part on terms of not less than one-fourth cash and balance to be evidenced by note or notes maturing within eighteen months from date of such sale, and to bear interest at the rate of 8 per cent. per annum, then said first parties will make and execute a deed of conveyance to the purchaser of such lot or lots expressing therein the consideration for which such sale is made, acknowledging receipt of the cash payment, which shall not be less than one-fourth of the purchase price, and take note or notes in their own names for the unpaid balance as above provided, which notes shall be secured by vendor's lien, and that such sum, less the $10 retained by the parties of the second part, as above provided, shall be applied as a credit on the unpaid balance owing to said parties of the first part by said parties of the second part, as hereinbefore provided, and that whenever the proceeds of sales and deeds made in pursuance of this agreement shall aggregate the amount sufficient to pay all of said balance of $35,945, then said first parties will execute and deliver to parties of the second part a general warranty deed, conveying to them all of remainder of said property embraced in this contract by proper and legal description, free and clear from any and all incumbrances.

"(5) It is a further agreement in the event said parties of the second part shall fail to make such additional cash payment of $7,500 within the time hereinbefore stipulated, then and in that event this contract shall become and remain null and void to all rights of said parties by reason thereof, shall cease

and terminate, and the said sum of $500 shall belong to said first parties.

"This contract is executed in duplicate this 15th day of July, A. D. 1909."

[1] The plaintiffs in error Bush and Harkrider paid the balance, the $7,500, making the total cash payment of $8,000, as provided for under the terms of the contract, and assumed the constructive possession of the property for the purpose of selling same and maturing their profit in expectation, there having been included in the contract some 517 lots, but failed to sell any of the property, and on September 15, 1911, the defendants in error Merrill and Roberds gave written notice to the plaintiffs in error of their intention to declare the contract at an end after the expiration of 30 days, and thereafter this suit was brought in trespass to try title for the property, which was replied to by plaintiffs in error that they had never violated the contract, the condition of sale never having occurred, and they had made diligent efforts to sell the property, having devoted time, energy, and money to that end, and having paid $8,000 in cash; that it would be inequitable for the opposition to exercise the right of rescission without the repayment to them of said sum of money; and as a further equity they averred that the "prospects from now on will be better for effectuating sales of said lots than they have been heretofore. * * * And that if they are allowed to go ahead and keep their said contract they will in due time complete the sale of all of said lots and pay plaintiffs in accordance with the terms of said written contract."

First. The insistence of the plaintiffs in error is that the contract testing the rights of the parties is conditional, and that, "where the promise to pay money is contingent upon the happening of an event in the future, such promise cannot be enforced until the occurrence of such event, and the burden is upon the party relying upon such promise to prove the occurrence of the event upon which the promise to pay matures"—citing the following authorities: Salinas v. Wright, 11 Tex. 576; Mitchell v. Clay, 8 Tex. 445; Hutchins v. Wade, 20 Tex. 7; Martin v. Shumatte & Matthews, 62 Tex. 189; Rowlett v. Lane, 43 Tex. 275; Carlisle v. Hooks, 58 Tex. 421; Lang v. Caruthers, 70 Tex. 722, 8 S. W. 604; Wright v. Farmers' Nat. Bank, 31 Tex. Civ. App. 406, 72 S. W. 103; Johnson v. Clements, 23 Tex. Civ. App. 112, 54 S. W. 275.

Of course the Supreme Court of this state, under the character of pleadings in those cases addressed to the matters in controversy, and the conditional contracts involved, have thoroughly established the doctrine that where a conditional contract is the measure of the liability, or rather where the happening of the condition is the test of the creation of the liability, and about which they have contracted, the cause is not established without proof of the happening of the extrinsic fact upon the existence of which the liability depends. It is true this contract says that the balance (that is, the $35,945) is to be "paid in manner and time as hereinafter stipulated," and that, "whenever the proceeds of sales and deeds made in pursuance of this agreement shall aggregate the amount sufficient to pay all of said balance," the defendants in error will execute a general warranty deed for the balance of the land. It is also true that the contract provides that: "It is the intent and purpose of the above agreement that whenever a sale of lots shall have been made by parties of the second part," upon the terms named, "then said parties will make and execute a deed of conveyance to the purchaser of such lot or lots," etc. But in interpreting the manner and time of the payment of the balance, the contract must be construed as a whole, and to construe that it continues until the plaintiffs in error pay the debt by the sale of the lots may amount to a practical forfeiture of an estate, as such a sale may never occur, this record is at least suggestive that it may be years before the land could be sold to meet the debt. It is true it may be said that defendants in error placed the price high; but it is also suggestive that the plaintiffs in error thought they could sell it higher, and entered into the contract open-eyed, without any circumstance of imposition or fraud. If it is a hard contract and the slump came and the loss results, it is one of bad speculation. The payment of the balance in the time and manner hereinafter stipulated, of course, does mean, when you sell sufficient property, you must pay the debt; but it further means that if you do not sell, under the third provision, you may have the land at any time you pay the balance; and we think it is an unreasonable interpretation to say that it was in the minds of the parties that the contract expressed a condition that the buyers may hold the estate indefinitely if it cannot be sold. If, at the time of the institution of the suit, instead of an ebb, there had been a flow and the lots had gone to $500 per lot and could have been sold at that price at that time, and they had refused to sell, and further desired to wait several years longer until it went to $1,000 per lot, lots being on the rise, arguing that their profits would be greater and they had a rigid contract, would not such a consequence be grossly inequitable? And unless the contract clearly gave the right would be intolerable. It will not do to answer "that the terms of the contract import good faith to sell, and of course we would have to sell at some time."

If this is a contract upon an exclusive condition which does not mature until the condition is created, and the parties have contracted solely upon the happening of the condition, the continuance of the contract is

regardless of consequences, and good or bad faith is not an element of its breach. In this agreement, Bush and Harkrider do not agree to make an effort to sell, but if their efforts, or lack of efforts, to sell could be addressed to a court of equity to determine whether the condition is to stand as a test for the ending of the contract, then it is not an exclusive condition. And if it is, however, admitted, and we are unable to see how plaintiffs in error can escape the conclusion that this estate cannot be held forever and a day, then it inevitably follows that the contract is not based upon the existence of an extrinsic fact as a test of its maturity, and, if not, then it matures within a reasonable time. It was contended in the argument of this case by plaintiffs in error that there was not any unconditional obligation to pay this debt, and no judgment could have been rendered against them for the balance, which we do not decide (but unless the sale of the land is a determining condition of the life of the contract); it does not assist their position; they have not bought the privilege for an indefinite time, under the third provision to buy the estate and mature the contract. Whether it is an executory contract to sell land, or an option to buy the land at any time with the privilege of maturing the contract by using the land as a fund to mature the debt, at least it is a different kind of a contract as a whole than those involved in the list of cases cited by plaintiffs in error, supra, and different cases very often make different principles of law. If it is contended that the sale of the land has to occur before plaintiffs in error may be divested of their interest, if the lots never go to $100 per lot (and the last heard of them in this record the tendency was about $50 per lot), then the sale may never occur; and, while the contract does not in terms set a limit of time beyond the time condemned by the rule against perpetuities, conditions may make it a perpetuity; and, while this contract would not be condemned by the rule itself, the consequences of this contract, on account of supervening conditions, which may bring it within the policy of the rule, may be an aid in construing the contract, and that such a consequence was never intended; that it is an unreasonable construction to say that an indefinite time for its performance would mean an indefinite estate to the other party. It will not do to say, You bound me not to sell for less than $100. For defendants in error, without fraud, accident, or mistake, had a right to their safeguard and security. Of course, if the cases cited by plaintiffs in error, and the principle therein involved, dominate the disposition of this action, this cause would arbitrarily end, without considering any other circumstance in this record, or any other feature of the contract; but a case embracing a contract involving a condition which

may amount to a defeasance of an estate or an unreasonable deprivation was not before the court in any of the cases cited; and in different character of contracts involving land, not necessary to quote, where the condition, if strictly construed, would be tantamount or tend to a forfeiture of an estate, there is a plentitude of cases establishing the doctrine of the law's disfavor; and again there are cases where to some extent the facts may trench upon the cases cited by plaintiffs in error, but where under the "condition" involved it would amount to an absurdity, affecting the rights of parties, the courts are unable to construe them as precedent conditions for the destruction of such rights when the parties could not have contemplated such a result, and to that extent the principles, at least, are applicable to the case at bar; and in quoting such cases we are not attempting, in the slightest, to impinge upon the principle deduced by the appellate courts of this state, in the character of cases decided by them. However, in passing, we will say it is to be noted that an inquisitive investigation of those cases cited reveals the absence of any attempt to declare upon anything but the conditional contract; no effort to plead alternatively for the maturity of the agreement in any other manner in lieu of the extrinsic condition named in the contract; or that a reasonable time would be a criterion of the expiration of the contract, aside from the happening of the condition.

The case of Nunez v. Dautel, 19 Wall. 560, 22 L. Ed. 161, involved the following duebill declared upon in two courts: "Due Joseph Dautel, or order, $1,619.66, being balance of principle and interest for four years and six months' services. This we will pay as soon as the crop can be sold or the money raised from any other source, payable with interest"—and that court said: "Payment was not conditional to the extent of depending wholly and finally upon the alternatives mentioned. The stipulations secured to the defendants a reasonable amount of time within which to procure in one mode or the other the means necessary to meet the liability. Upon the occurrence of either of the events named or the lapse of such time, the debt became due. It could not have been the intention of the parties that if the crop were destroyed, or from any other cause could never be sold, and the defendants could not procure the money from any other source, the debt should never be paid. Such a result would be a mockery of justice."

The Supreme Court of Kentucky, in the case of Hicks v. Shouse, 56 Ky. (17 B. Mon.) 486, considered an obligation where a promise was made to pay for a negro "the sum of $500. * * *" And a further promise "to pay said money so soon as I sell a house and lot in the city of Lexington, bought of C. J. Sanders and wife; and, until said sale is made, I promise to pay eight per cent. in-

terest per annum on said sum." That Supreme Court said: "A reasonable construction should be given to the covenant; the intention of the parties should be effectuated, if practicable, and their understanding carried out. Such a construction, as we think, results in the conclusion that the house and lot was to be sold in a reasonable time, or the money be paid without a sale. The argument of defendant's counsel would, as it seems to us, lead to an absurdity, and would do violence to all reasonable calculations as to the intention of the parties. It leads to the conclusion that the defendant, by paying 8 per cent. interest annually might postpone the payment of the debt to an indefinite period"—just as in this case the conclusion follows that nonaction upon the part of plaintiffs in error, or practical conditions, could indefinitely forego the restitution of this land to the defendants in error. And that court further said: "As we understand the covenant, construing it according to its reason and spirit, * * * that the defendant, by paying an annual interest of 8 per cent., might have a reasonable time to make sale of his house and lot, not that he might sell when he pleased, and pay when he pleased."

In the case of Randall v. Johnson, 59 Miss. 317, 42 Am. Rep. 366, where there was a promise to pay for the rigging of a vessel 90 days after its first return trip, Justice Campbell of the Supreme Court of Mississippi said: "It would be 'a mockery of justice' to hold that because the schooner was lost at sea, and therefore had not made her first return trip, the appellee lost his debt."

In Sears v. Wright, 24 Me. 278, the condition was "from the avails of the logs bought of us, when there is a sale made," and held payable in a reasonable time, and the court said: "By the terms of that contract it could not be inferred that the plaintiff had consented to subject himself to any such contingency (that is, that the logs could not be sold). His agreement was to wait until the logs could be sold; thus the defendants had a duty to perform. They were bound to sell the logs and to do it within a reasonable time." The Maine Reports are not accessible to us, and we extract the above from the case of Noland v. Bull, 24 Or. 479, 33 Pac. 983; the second syllabus announcing a principle involved in that case that: "Where a debtor delivers to his creditor an obligation to pay to the obligee the amount of the debt, 'when' certain property owned by the obligor is sold for not less than a certain specified sum, such obligation is an agreement to pay within a reasonable time, whether such property is sold or not."

And in the case of Crooker v. Holmes, 65 Me. 195, 20 Am. Rep. 687, the Maine Supreme Court again held, quoting the Sears-Wright Case, supra: "Where a promissory note was made 'payable when I sell my place where I now live,' the maker was bound to sell his place within a reasonable time, and failing in that the note was due."

This evidence indicates that defendants in error expected to realize upon this deal in a few months and contemplated some system of rapid sale, condemned by the United States government, and thereafter abandoned by them on that account, which does not devitalize their equities, if they have any, but is suggestive of their avidity in buying the land. The provisions quoted and the other provisions of the contract are indicative of the desire upon the part of the landowners when they gave the power to plaintiffs in error to sell the land, to safeguard and secure it; necessarily if the lots were worth $85 per lot, the owners of the land would not permit the property to be sold for $25 per lot, as they were required to take the notes and cash, as proceeds of the lots sold, in liquidation of the balance of the debt. It also evidences that all the parties clearly contemplated that the sale of the land would be consummated within a few months and not at some unreasonable, indefinite period in the future; nor does it indicate, but negatives, the condition of an indeterminate holding of the land by Bush and Harkrider, and if this evidence is any aid whatever as a criterion in determining time, and we think that it is, the two years and three months holding of this land by plaintiffs in error is considerable in excess of the time contemplated when the contract was made, as the prospects of an early sale of this property were discussed between the parties at the time of the execution of the contract, except the methods of sale to be pursued. The contract and its conditions and limitations we think bespeak a system by virtue of which the buyers could take the land at any time by paying the balance or sell the land for that purpose within a reasonable time, with the several provisions for the benefit of the landowners as security and safeguard to them in the event the land was sold.

"Where a party to a contract undertakes to do some particular act, the performance of which depends entirely on himself, and the contract is silent as to the time of performance, the law implies an engagement that it shall be executed within a reasonable time, without reference to extraordinary circumstances. See Chitty on Contracts, 11 Am. Ed. 1062." Hamilton v. Scully, 118 Ill. 198, 8 N. E. 769.

"What is a reasonable time depends undoubtedly upon the nature and character of the thing to be done, the circumstances of the particular case, and the difficulties surrounding and attending its accomplishment." Hart v. Bullion, 48 Tex. 289. The difficulty of the performance may be a circumstance, of course, to postpone the time; but where the testimony shows it is one practically in-

surmountable, on account of uncontrollable conditions, it should not have a talismanic effect to unreasonably postpone the time. We believe, and so decide, that a reasonable time is applicable to the maturity of this contract.

[2] Second. While this was an action of trespass to try title, however, on the question of the right of rescission, and the alleged countervailing equities advanced in opposition to the right, replied to by a supplemental petition, in the main it was resolved as to the questions of equity into a matter of special pleading. If we are correct that the contract matures within a reasonable time, and is not conditional to the extent contended for by plaintiffs in error, the legal title remaining in the defendants in error under this contract, the matter of rescission is solved by the principles of equity when the right is asserted and attempted to be rebutted as in other cases.

The town of Lubbock is upon a section of land, "and the courthouse is supposed to be in the center of the section," and the town as almost surrounded by additions, some of the property out of which has been sold, but how much for the purpose of resale or is vacant property, or has been improved, or what is the size of the town, is not disclosed. The testimony indicates that the property was purchased at "the top of the boom" and in a very few months the recession began, and, while the 517 lots sold to Bush and Harkrider for $85 per lot, at the time of the trial it had reduced in valid either to 50 per cent. of its cost price, or to $50 per lot. Shortly after the execution of the contract, the plaintiffs in error, after certain preliminaries had been effectuated in procuring agents, literature, and installment contracts in blank, the prices were fixed upon the lots for sale "at from $140 to $350 on a perfectly straight selling proposition," but none of the lots were sold. At this time, as expressed by Bush, "there was a fearful boom with the Quanah, Acme & Pacific coming," which, however, was not built, and some talk of the Crosbyton road, which was afterwards constructed into Lubbock, from Crosbyton, a distance of about 40 miles. After the first attempts were made to sell the property at the prices above mentioned, there is testimony indicating that some attempt was thereafter made by the Western Realty Company, the assignee of the contract, of which Bush and Harkrider were also stockholders to sell some of the lots at $100 per lot, which also failed; when this effort was made is not disclosed.

Bush, who was the moving spirit in the purchase of the contract, said: "At the time we went into this contract, the conditions here in Lubbock looked pretty good. I think we paid more than the market value of the property in controversy in this case when we bought it. I had a faint idea of the market value of the property, and what in-duced me to go into the proposition and pay more than the stuff was worth was that I though we could get on the outside and sell this property. I knew that the scheme propositions that were being worked for the sale of property in this town were pretty good, and I thought we could get out and work a scheme"—and we are rather inclined to think he expresses the inefficiency and lack of equity of his own defense when he simply says: "My position in this case is partially that I and my associate came here and bought this property, paying more than the market value for it, under a contract giving the right to sell it, and owing to the activities of the federal government our scheme fell down, and in the meantime the prices depreciated and we were unable to carry out the contract we made, and therefore we wanted our money back." Even if they had intended to force people to purchase this property vi et armis, it would not denude plaintiffs in error of a single right cognizable in equity in this proceeding; but the record seems to ring with an undertone of complaint by plaintiffs in error against the contract as a hard one, and vitalize it into a seeming equity, not directly, but by implication. The evidence is that it was merely a bad speculation. Roberds, one of the defendants in error, said, "Real estate was very active in July, 1909. We were selling property quite lively I think; that is, the Merrill addition" (meaning this property), and "for quite a while after the 1st of August, 1909, these conditions prevailed, for I bought quite a lot of stuff after that at a pretty good price compared with what I could get for it now. I mean, by quite a while, two or three months"—and testified that the reasonable market value of the property per lot in July, 1909, was from $80 to $100 per lot, and had sold some of the lots, the closest ones, before they sold in bulk to Bush and Harkrider, at just what price is not stated, but said they did not get over $100 per lot for any of them; and further testified that either Bush or Harkrider (he was not certain which) said, "We will have all this thing closed out in less than six months, and we will have our money."

We find that plaintiffs in error made a diligent effort to sell the property within the limitations of the contract, for several months after its execution, at the prices indicated above, until conditions and the depreciation in the value of the property made it impracticable to continue further efforts in pursuing any method of selling by lots, and that plaintiffs in error have expended something like $2,100 for the purpose of selling said lots, and the evidence discloses that at the time of trial there was an expectation of the construction of what is known as the Texas Cut-Off by the Santa Fé from Lubbock to Texico, but nothing tangible is exhibited in the record as having been addressed to the

district judge, who tried the case, that the realization of this branch, the division having been placed at Slaton, a few miles south on the Santa Fé, would materially affect the value of the property; the result necessarily being speculative, the evidence showing that the construction of the Crosbyton road did not arrest the downward tendency of the property, and the testimony of the better prospects is more opinionative and conjectural than evidentiary of something a court of equity can grasp.

Third. We are unable to find from this record any tangible equity rebutting the right of rescission by defendants in error. The limitation placed upon the value of the price of the lots by the contract is stressed by plaintiffs in error and italicized in the brief in the quotations from the testimony as an element entering into their inability to sell the land, and suggested, if not argued, as an ingredient of equity. As stated, defendants in error were required to take the proceeds in liquidation of the $35,945 balance, except $10 per lot to be retained by the sellers for expenses, and the property had been sold at $85 per lot, which left a margin of $5 per lot within the limitation. If the limitation of price had not been inserted, with the power to sell by lot having been granted to Bush and Harkrider, complications would have ensued; it was as much a privilege to Bush and Harkrider as a protection to the others, and upon analysis is at best a cry of a bad bargain which defendants in error are not responsible for from the viewpoint of equity. How the $2,100 expended by plaintiffs in error can become a circumstance of an equitable right we are unable to see. If a man buys land from another and spends $2,100 trying to sell it for the purpose of paying the debt and reaping his profit, and fails to sell, it may be unfortunate; but, as a circumstance for equitable consideration, it is intangible. Of course if successfully expended it would be a benefit to defendants in error in the payment of the debt; so would the successful expenditure of the same amount of money as a bonus to others to borrow the money to pay the debt. There was nothing added to the estate; plaintiffs in error merely took their chances.

It is true Chief Justice Brown, in the case of Lipscomb v. Fuqua, 103 Tex. 585, 131 S. W. 1064, mentioned the lack of allegations of expenditure of money and the lack of efforts to sell the land (in a contract quite similar to the one here), but he evidently means that such efforts and expense would be such as had created a condition beneficial to him (Lipscomb) as an equity which Fuqua had inequitably destroyed, and, as he puts it, that on account of the lack of such allegations "there had not grown up any condition from which he [meaning Lipscomb] could expect to reap a benefit by the continuance of the contract beyond the time fixed for payment"; and in the case at bar we can see nothing whereby any condition has been created, either by plaintiffs in error, or otherwise, by virtue of which they could address it to a court of equity as a tangible benefit to be reaped by them by a continuance of the contract, and which the defendants in error have cut off, if a reasonable time applies to the sale of the land. In that case a time limit was set in which the money was to be paid, and the Supreme Court decided, construing the pleadings, upon a general demurrer which had been sustained by the lower court, that Lipscomb had done nothing and exhibited no countervailing equity, giving Fuqua a clear right to rescind; the Supreme Court said: "It was an executory contract of sale to be consummated by the performance on Lipscomb's part by making the sale and paying over the money to Fuqua. This he had not done within the time specified in the contract, nor up to the time Fuqua declared a rescission of the contract and took possession of the land." Under the terms of that contract, it was agreed that Lipscomb had the right to sell the land in whole or in part, and that he would turn over the money received from the sales to Fuqua until the full amount of $63,744, balance, had been paid; also providing safeguards to Fuqua in the event the land was sold in portions. If no time had been set in that contract for the expiration of the same, and an unreasonable time had expired when Fuqua had rescinded the contract, from the logic of that case the result would have been the same. In this case the defendants in error offered a deed to the land upon payment of the balance of the money which is refused. This, of course, plaintiffs in error could have demanded at any time by the payment of the money. Not quite one-fifth of the whole purchase money was paid, and, even if the obligation to pay were an unconditional one (which seems to be denied) and defendants in error were remitted to a foreclosure, there is no equity in the land to be disposed of on account of its depreciation, and there would be every expectation of a deficiency judgment.

Appropriate, we believe, to this matter, we quote the following from the case of Moore v. Giesecke, 76 Tex. 543, 13 S. W. 290: "We repeat what has already been said when we say that, when the vendor's suit is predicated upon the mere refusal of the vendee to pay the whole consideration contracted for, the facts that the vendee has paid part of the consideration and made permanent and valuable improvements, coupled with possession of the property, unaided by some other sufficient equity, will not entitle him to recover for such purchase money or improvements. In such cases, when the vendor has neither waived his legal rights nor committed any default, he cannot be involuntarily taxed with improvements made upon his property without his consent, or

be made to pay a price for recovering it back. The remedy by rescission is not favored, and, as has been said, slight circumstances, when they may be. properly treated as indicative of a purpose upon the part of the vendor not to insist on that remedy, may be treated as a waiver of the right to rescind, unless its maintenance becomes necessary to enable the vendor to enforce the payment of the consideration for which he contracted to sell the land; and when a suit for the recovery back of the land has been brought, where any portion of the purchase money has been paid, or where valuable and permanent improvements have been placed upon the land by the vendee or by the purchasers under him, and the defendant, when sued, brings into court and offers to pay the balance of the purchase money, with costs of suit, there exists strong countervailing equities, the money ought to be received, and a recovery of the land denied. On the other hand, when the vendee does not seek to perform the contract, and the vendor shows himself entitled to recover back the land, then, before he should be compelled, as a condition of its reacquisition, to pay for improvements or refund purchase money, equitable rights to such relief should be shown by the vendee. It should appear that it will not be unjust to the vendor to so charge him."

We do not think the language of Justice Henry, "when the vendee does not seek to perform the contract," assists the plaintiffs in error, because the evidence shows they tried to sell the land and failed, which was optional upon their part to do. Of course a vendee may make every effort in his power to raise the money to pay the debt, where even it is his contract to do so, but, if he makes the effort and fails, it is not an equity because of failure. See, also, Banks v. McQuatters, 57 S. W. 335, and Bank v. Jackson, 40 S. W. 833.

We conclude. the cause should be affirmed, and it is so ordered.

### On Motion for Rehearing.

The plaintiffs in error say: "No case has been cited by this court * * * to the effect that, where the limitation of price was fixed by the payee and the time had never been that a sale could be made at such price, the debt matured within a reasonable time after the making of the obligation"—and argue that, because the contract contained the provision that the property should not be sold at less than $100 per lot, it is a limitation by defendants in error; and, as the time when they could be sold at that price has never arrived, a different principle of law prevails, at least to the extent, that, if the former owners of the land desired a restitution, they should restore. We admit we were unable to find a case involving a contract to purchase land approximating in terms and legal effect to the one we have

here; the nearest in terms is the one embraced in the Lipscomb-Fuqua decision, decided by our Supreme Court, cited in our original opinion. We may not conceive the contract completely enough, and may apply the legal principles slantingly; however, we believe plaintiffs in error do not give the contract broad enough scope. The $100 per lot condition is a limitation upon the action of plaintiffs in error of course; and, when a man sells a piece of property and reserves the legal title and a lien upon the property, that in effect is also a condition upon a right of sale; at least it has to be paid and is a limitation to the business world. Appellants had something more than this; they had the right to sell this property in parcels, compel the former owners of the land to take the deferred vendor lien notes as part payment upon the balance of the debt, after retaining $10 per lot for themselves. If lots had risen in value, or could have been sold, it was a valuable stipulation from a business standpoint; and as pointed out in our original opinion, the vendors having agreed to take the deferred notes in payment of the debt, necessarily there should be a limitation of price, and we construe this provision as mutual; and, if in the lottery of business it proved to be a limitation, we are unable to vitalize it is an equity. Plaintiffs in error annex this to the proposition of a conditional contract by arguing, in effect, that defendants in error did all this, fixed the price at which the property was to be sold; "and, it being clearly shown that the time had never yet arrived when these conditions could have been met, certainly the rights of the parties must be governed by a different principle of law." Any vendor who sells property and retains the title or the vendor's lien with a balance unpaid practically fixes the price as to successive purchasers; so does the immediate vendee when he trades in that way. As said, this deferred debt has to be accounted for, and, if the vendee bought too high, he would be in the same condition as these vendees; he could not sell to others.

Under the fourth provision of this contract, the plaintiffs in error were authorized to sell in bulk or in lots "at such prices and upon such terms as they may desire"; except where they sold in lots, the sale was required to be upon the limitation mentioned. Defendants in error were required to take notes; and plaintiffs in error arguing (which we are not deciding) that as they did not owe any money until this occurred, and as they did not have to pay the debt in any other manner, it would be inequitable to rescind, admitting, however, that the $2,100 expended by them in an endeavor to sell the property "cannot constitute the equity referred to in the law books." If so, then the proposition harks back solely to one purely of condition, which we attempted to analyze in our original opinion, and again say we do not think plaintiffs in error sound in the full

scope of the contract. When they paid $8,-000, they not only had the right to use the land as a fund by sale in parcels to pay the debt, but, if they are correct in saying that they have no obligation to pay anything until they sell the property, they, however, bought the privilege to mature the contract at any time and own the property, which is an option and a valuable right, and which option should be matured in a reasonable time.

The third provision of the contract provides that, upon payment of the balance, the defendants in error shall deed the property, and under the contract this balance is payable without interest. This record discloses that for some period of time after plaintiffs in error purchased this property they were offering the same and fixed the price at from $140 to $350 per lot. Their efforts at this time were of course along the line of a prospective profit. This was during the "boom," and no efforts were made to sell the property during this period at a price to realize their equity and obtain the money, which they now claim should be restored to them, and necessarily the vendors during this period were cut off from any realization upon the property. This right was Bush's and Harkrider's, or their grantee's. Of course it is speculative at what price defendants in error could have sold the property during this period if they had owned it; that right had been purchased by plaintiffs in error, and the consequences are in the nature of liquidated damages. Durst v. Swift, 11 Tex. 273. At least it would be so in an ordinary contract of sale where the vendors were not in fault, although uncontrollable conditions would make it a hardship upon the vendees, and it seems to us that a patient analysis of this contract, if a reasonable time applies to the maturity of it, the same result should logically follow.

Motion for rehearing is overruled.