## HOWARD v. HANCOCK OIL CO. OF CALIFORNIA.

### No. 7042.

Circuit Court of Appeals, Ninth Circuit. Jan. 23, 1934.

O'Melveny, Tuller & Myers and Albert Parker, all of Los Angeles, Cal., for appellant.

Knight & Armour, of Long Beach, Cal., for appellee.

Before WILBUR, SAWTELLE, and MACK, Circuit Judges.

MACK, Circuit Judge.

This is an appeal by the receiver of the State Company from an order of the District Court allowing the claim of the Hancock Oil Company in the sum of $121,011.69, with interest, as a general claim against the receivership estate.

The claim arose out of the following transactions: On or about March 7, 1928, the State Company and the Richfield Oil Company entered into a written agreement, the former to sell and the latter to buy, during a period of three years from March 7, 1928, and continuing thereafter subject to cancellation by either on six months' notice, the total amount, up to a certain maximum, of crude petroleum oil of specified gravity and temperature, owned by the State Company at its dehydrating plant at the Long Beach oil field. The agreed price for oil of the specified gravity was to be 10 cents per barrel higher than the prices publicly offered by the Standard Oil Company of California for oil of like gravity and quality. On November 7, 1928, while this contract was in force, the Hancock Oil Company and the State Company agreed in writing, the former to sell and deliver, and the latter to receive and pay for, all the surplus oil, up to a certain amount, owned by Hancock in excess of the requirements of its refinery and of its contracts then in force. The price was to be 5 cents per barrel above the price publicly offered by the Standard, and the contract was to continue in force from November 7, 1928, to March 7, 1931, unless terminated under certain conditions, on notice by either party.

The relevant sections of this contract are set out in the margin.[1]

[1] "'Term and Quantity. The Seller hereby sells and agrees to deliver to the Buyer and the Buyer agrees to receive and pay for the surplus crude petroleum oil, which the Seller may have over and above its aforesaid requirements, with limitation as to quantity, nevertheless, as hereinafter set forth, for and during the period beginning on the 7th day of November, 1928, and ending on the 7th day of March, 1931.

"'The Buyer agrees to accept all oil offered * * * hereunder but * * * not * * * more than Sixty Thousand (60,000) net barrels * * * in any one month * * * delivered in equal amounts daily as near as possible so to do, but not more than Three Thousand (3,000) net barrels in any one day. Should * * * Seller * * * fail to offer hereunder at least Twenty Thousand (20,000) net barrels of crude oil in any one month, then * * * Buyer shall have the right to cancel this agreement upon ten (10) days written notice to the Seller. The Seller may terminate this contract at any time by giving to the Buyer ten (10) days written notice of said cancellation.

"'Deliveries. All deliveries hereunder shall be made by the Seller into the pipe line system of the Buyer at a point (specified) or any other * * * mutually agreed upon in the Long Beach Oil Field. * * * Seller * * * to make the necessary connection, * * * but all of said oil shall be gauged in the tanks from which it is delivered. * * * All the pipe line oil delivered hereunder free from water, sand and other foreign substances, as ascertained by any standard method of testing, * * * and should said test fail to prove the existence in said oil of more than three per cent (3%) water, sand and other foreign substances, then said oil shall be immediately redelivered as soon as received to said Richfield Oil Company; that all wet oil delivered hereunder shall be immediately dehydrated in the dehydrating plant of the Buyer, * * * and as soon as same has been dehydrated, said oil shall be immediately delivered by the Buyer to said Richfield Oil Company, at the Buyer's plant. It is further expressly understood and agreed that the ownership and title of all oil delivered hereunder shall be and remain in the Seller until such time as the same has been gauged by said Richfield Oil Company in the tanks into which it is delivered at the plant of said Buyer.

"'Prices. The Buyer agrees to pay * * * a price of five (5¢) per barrel above the current price per barrel publicly offered on day of delivery by the Standard Oil Company of California to producers generally in the Signal Hill Oil Field for petroleum of like gravity and quality.

"'Payments. The Buyer agrees to pay * * * twice each month, to-wit: on or before the 25th day of each month for all oil delivered hereunder from the first to the fifteenth days, both inclusive, of such month and on or before the 10th day of each calendar month for all oil delivered hereunder from the 16th to the last day, both inclusive, of the last preceding month. All such payments to be made by the Buyer to the Seller at the Security Trust and Savings Bank, First Street and Pine Avenue, Long Beach, California, and, in this connection, it is expressly understood and agreed that all oil delivered by the Seller to the Buyer hereunder shall be sold and delivered by the Buyer to said Richfield Oil Company and that the Buyer will require said Richfield Oil Company to pay for all oil delivered to it by the Buyer once each month, to-wit, on the 10th day of each month for all oil delivered to said Richfield Oil Company in the last preceding month, and will require such payments to be made by said Richfield Oil Company to the Buyer herein at said Security Trust and Savings Bank, First Street and Pine Avenue, Long Beach, California, and will require the Buyer to instruct said bank to pay to the Seller herein out of the proceeds received from said

At the time of the execution of this second contract, there was in force an irrevocable order by State on and accepted by Richfield executed contemporaneously with their agreement of March 7, 1928, for payment to the Security Trust & Savings Bank of Long Beach of all sums to become due thereunder. On November 7, 1928, State and Hancock executed escrow instructions, accepted and approved by Security, by which it was agreed that Security, without authorization from Hancock, would not consent to revocation or modification of State's order on Richfield, and that Security would pay to Hancock the amount due under Hancock's contract with State, out of the moneys paid it by Richfield subject to priorities as specified in the agreement, the essential parts of which are set out in the margin.[2]

Deliveries under the contract between State and Richfield continued until January 15, 1931; deliveries under the contract between Hancock and State until January 21, 1931. Some time prior to February 24, 1931, Richfield went into receivership. On creditor's bill filed February 24, 1931, by the Dollar Oil Corporation and admission of its allegations by defendant, the State Company, a receiver was appointed for State, the bill alleging, inter alia, that State was "particularly embarrassed by the large claim of the Hancock Oil Company in the amount of over $121,011.69." On behalf of State and Security, the receiver filed a proof of claim against Richfield in the sum of $172,675.18 for deliveries of oil between December 1, 1930, and January 15, 1931.

Hancock filed the present contested claim for $121,011.68, plus interest, for deliveries of oil to State between December 1, 1930, and January 21, 1931. The District Court, confirming the report of the special master, allowed the claim as a general claim, and also ordered that all funds received from Richfield, as provided in the escrow instructions of Hancock and State, be paid to Security First National Bank of Los Angeles at the Long Beach main office, and distributed in accordance with the escrow instructions.

The contentions of appellant, urged below and repeated here, are (1) that the contract between Hancock and State, together with the escrow instructions created not a general obligation on the part of State to pay for the oil delivered, but only a limited obligation to pay out of the particular fund created by Richfield's payments to the bank; or (2) that the agreement between Hancock and State was not a contract of purchase and sale, but a contract creating an agency under which State was to sell oil for Hancock to Richfield. In support of these contentions, and on the theory that the written agreements were ambiguous, evidence was offered to aid in the construction of the contract. The findings of the special master, adopted by the District Judge, were to the effect that there was no ambiguity in the written agreements, that the objections to the receipt of any evidence as an aid to the construction of the contract were therefore well taken.

---

Richfield Oil Company for all oil delivered by the Seller to the Buyer hereunder under the terms of this agreement, such payment to be made by said bank to the Seller upon presentation by the Seller to said bank on or before the 10th and 25th days of each month, of run tickets showing deliveries of oil hereunder for the aforesaid monthly period, a copy of which run tickets shall also be mailed by the Seller to the Buyer * * *, on or before the 5th and 20th days of each month. Such run tickets need not be approved by the Buyer before such payment is made by said bank but if the Buyer has any objection thereto, he shall notify said bank and the Seller thereof at least one day before such payments are made to the Seller.' "

[2] " 'The Richfield Oil Company will pay to the Security Trust and Savings Bank of Long Beach, on the 10th day of each month thereafter the sum due for oil furnished it under the aforesaid contract with the The State Company. Said The State Company has executed an irrevocable order upon the Richfield Oil Company to pay all sums due under the aforesaid contract to the Security Trust and Savings Bank of Long Beach, which order has been approved by said Richfield Oil Company. It is agreed that said order to the said Richfield Oil to pay to the Security Trust and Savings Bank of Long Beach as aforesaid cannot be revoked by the said The State Company without the written consent of said Security Trust and Savings Bank of Long Beach, and that while the aforesaid agreement is in effect between said Hancock Oil Company and said The State Company, the said Security Trust and Savings Bank of Long Beach will not give its consent to a revocation or modification of said order unless it is first authorized to do so, in writing, by said Hancock Oil Company. * * *

" 'Upon receipt of the money under and by virtue of the aforesaid order from the Richfield Oil Company, the Security Trust and Savings Bank of Long Beach is authorized to disburse same as follows:

" '1st. To the payment of any and all fees and expenses as herein provided for or such additional expense as it may necessarily incur in carrying out the terms of this agreement.

" '2nd. To the payment to Security Trust and Savings Bank of Long Beach of such monies, together with interest thereon, as shall have been loaned by the Security Trust and Savings Bank to The State Company. It being agreed, however, by the parties hereto, and the Security Trust and Savings Bank is hereby instructed that at no time will advances be made to The State Company wherein the total amount advanced plus the amount due Hancock Oil Company will exceed 95% per cent of crude oil delivered to Richfield Oil Company, as represented by Richfield Oil Company's crude oil run tickets issued to The State Company and delivered to the Security Trust and Savings Bank of Long Beach.

" '3rd. To pay to Hancock Oil Company, * * * the amount shown to be due said Hancock Oil Company by the statement of crude oil run tickets issued by The State Company in favor of the Hancock Oil Company and delivered to the Security Trust and Savings Bank.

" '4th. To pay to The State Company, or their order, * * * the balance of any money remaining.' "

and that the contract was one of purchase and sale between Hancock and State, in which the provisions regarding payment out of moneys paid by Richfield were made, not to limit State's obligation to a particular fund, but to give Hancock the benefit of additional security. If these findings are supported by the evidence, Hancock as seller was a creditor of State, as purchaser.

We are of the opinion that the documents themselves unambiguously express the intention of the parties. Since, however, the evidence offered by appellant is not inconsistent with the conclusions of the court below, we shall also consider it, even though it may have been properly excluded under the parol evidence rule.

1. Of course if the parties had so wished, they could have limited the obligation of State to pay out of a particular fund, as was done in the cases cited by appellant. In most of them, however, the only statement of a promise to pay was expressly qualified in the very sentence by some such phrase as "as follows," Chambers v. Jaynes, 4 Pa. 39 (1846); Warman Steel Casting Co. v. Redondo Beach Chamber of Commerce, 34 Cal. App. 37, 166 P. 856 (1917); or "in manner hereinafter specified," W. W. Montague & Co. v. Leonard, 135 Cal. 209, 67 P. 126 (1901); "payable as and when," Carpenter v. Elmer R. Sly Co., 109 Cal. App. 539, 293 P. 162, 163 (1930); or "according to the following conditions," Palmer v. Guillow, 224 Mass. 1, 112 N. E. 493 (1916). In Frank v. Butte & Boulder Mining & Lumber Co., 48 Mont. 83, 135 P. 904 (1913), there was no express promise to pay other than the statement that the money advanced "shall be repaid * * * by the said company, out of the first earnings of its business." Cf. Lyman v. Northern Pac. El. Co., 62 F. 891 (C. C. Minn., 1894). In Gardiner v. Equitable Office Bldg. Corp., 294 F. 496, 498 (C. C. A. 2d, 1923), there was a separate promise to pay "$100,000 cash and $100,000 par value of the common stock of the company." The cash commission was to be paid out of the first moneys available from the sale of the preferred stock and second mortgage bonds of the company. But the company contemplated was never formed, and the deal was not actually consummated in the way anticipated. In Orman v. Ryan, 25 Colo. 383, 55 P. 168 (1897), there was an unqualified promise to pay, but there was no time of payment specified, other than when the particular fund should be realized. The case was tried by the plaintiffs on the theory that the liability of the defendants was condition-

ed on the fund being realized, and the court refused to allow them to shift, on rehearing of the appeal, to the theory that it was not. There is, however, considerable authority to the effect that such a contract creates an unconditional liability to pay within a reasonable time. See Nunez v. Dautel, 19 Wall. 560, 22 L. Ed. 161 (1873); Morrison v. Sycamore Canyon Gravel Co., 102 Cal. App. 536, 283 P. 84 (1929). Cf. Barber Asphalt Paving Co. v. City of Denver, 72 F. 336 (C. C. A. 8th, 1896).

In the contract between Hancock and State, an unconditional promise to pay appears three times; once in connection with term and quantity; again in connection with prices; and finally in connection with the time of payment. When the manner of payment, out of moneys paid into Security by Richfield, was finally mentioned, it was introduced by the phrase, "and, in this connection, it is expressly understood and agreed," thus making an addition rather than a qualification or condition.

Appellee suggests, as a further indication that the obligation of State was not limited to the particular fund, that Hancock was not entitled to the entire fund or even a definite part of it, but only to the balance remaining up to the amount of State's indebtedness after Security had been repaid for its expenses and advances to State. The strength of this argument is, however, considerably diminished by the limitation in the escrow agreement that at no time should the advances to State, plus the amount due Hancock, exceed 95 per cent. of crude oil delivered to Richfield.

Consideration of the contract as a whole, as well as of its particular provisions, supports the finding that the provisions regarding the payments by Richfield were intended to provide additional security to Hancock, rather than to limit its right to the particular fund. It is not altogether uncommon for the seller to attempt to tie up the proceeds or profits of resale as security for its own claim arising out of its sale of the goods. In Bush v. Merrill, 156 S. W. 606, 610 (Tex. Civ. App., 1913), a contract with respect to land containing very similar provisions, reserving title in the seller until the entire purchase price should be paid, specifying terms of resale, and requiring payment of the balance of the purchase price directly out of the proceeds of resale, was construed to create an unconditional obligation to pay the balance within a reasonable time, "with the several provisions for the benefit of the

landowners as security and safeguard to them in the event the land was sold." In Pritchard v. McLeod, 205 F. 24 (C. C. A. 9th, 1913), where the contract expressly provided that the purchaser "agrees to buy (mining claims) for the sum of thirty thousand dollars ($30,000.00) upon the following terms and conditions," and one of the terms was that part of the purchase price should be paid out of 25 per cent. of the gross output of gold from the claims sold, the court held that the intent of the provisions was sufficiently doubtful to permit the introduction of parol evidence to determine whether they were intended to make the obligation conditional or only to "furnish a measure of security to the vendor."

In the instant case, there is hardly sufficient doubt on the face of the instruments to justify a similar procedure. But the evidence offered by appellant, even if considered, would not change the interpretation based on the language of the documents. The evidence was that, in the course of preliminary negotiations, the President of Hancock stated that he "was quite well aware of the financial position of State and that it would be necessary if the transaction were to be consummated, to make some appropriate arrangement whereby Hancock would be sure of getting its money." To effectuate this, the escrow instructions were suggested by officers of Hancock. This evidence is entirely consistent with the theory that the intention of the parties was to tie up the money paid State by Richfield as security for State's obligation and the documents were drawn so as to obligate State and Security, but not Richfield, to Hancock. The other evidence offered to substantiate appellant's position was that Hancock ceased deliveries as soon as Richfield went into receivership. Assuming that this is admissible as a practical construction of the contract, it is not persuasive, because Hancock might have considered itself privileged to terminate the contract upon failure of its security or might have preferred to subject itself to suit for damages rather than to risk further losses. Finally, viewed as a practical construction of the contract, Hancock's cessation of delivery is counterbalanced by State's consenting to the receivership largely because of Hancock's claim against it.

2. Appellant's contention that the contract between Hancock and State was one of agency rather than of purchase and sale is based primarily upon two of its provisions: (a) That the oil delivered to State must be delivered to Richfield immediately, or immediately after dehydration, and (b) "that the ownership of all oil delivered hereunder shall be and remain in the Seller until such time as the same has been gauged by said Richfield Oil Company in the tanks into which it is delivered at the plant of said Buyer." The argument is that, despite the consistent use of words proper for a sales contract, these provisions raise sufficient doubt to permit the introduction of parol evidence tending to show that the intended relationship was one of agency.

Viewing the contract as a whole, it would seem to be clear that Hancock's retention of title until the oil had been gauged by Richfield was but the retention of a security title. This interpretation and this alone is consistent with the language used. Hancock was the seller; State was the buyer. The sale was consummated on the delivery into State's tanks; at that moment State became indebted for the purchase price. Assuming the technical meaning of "gauging" to be in accordance with appellant's rejected testimony, that is, that the gauging would be completed only as the oil was delivered from State's tanks into Richfield's pipe lines, the security title would at that moment be relinquished, inasmuch as Richfield would contemporaneously with the delivery to it become indebted to State, and, pursuant to the terms of the escrow and the irrevocable order accepted by Richfield to pay the purchase price to Security, Richfield's indebtedness to State would be the substituted security to Hancock. The retention of title as security is not inconsistent with a contract of sale. Even though State's complete title free from the retention as security is perfected only at the moment that State itself transfers that title to Richfield, and thus State itself becomes a conduit for the passing of the complete title originally in Hancock ultimately to Richfield, nevertheless contemporaneously with this passage State has full title if but for an instant.

True it is that title might also have been retained by Hancock in order that it might itself by recapture transfer the title to Richfield. But the absence of any provisions for such recapture, the fact that Hancock had no contract with Richfield, the further fact that State's contract with Richfield long antedated its contract with Hancock, and that therefore Hancock could not be State's undisclosed principal as to that contract, the absence of any proof that Hancock and State ever negotiated on an agency basis except by the use of the word "commission" as herein-

after considered, all confirm the interpretation that we have given that, when the parties spoke of "buyer" and "seller," they meant thereby to indicate the parties to a contract of sale and not of agency.

Appellant further urges that, unless Hancock's retention of title were construed as retention by a principal, and unless State therefore were but an agent, the clause restricting State's right to dispose of the oil to a transfer to Richfield would be illegal as an unreasonable restraint of trade. It is to be observed, however, that this restriction is not a general one in a series of contracts, but it is specifically in one contract, and that for the very definite legitimate purpose of preserving the seller's security. In these circumstances, the restraint of trade cannot be deemed unreasonable. See John D. Park & Sons Co. v. Hartman, 153 F. 24, 41, 12 L. R. A. (N. S.) 135 (C. C. A. 6th, 1907); United States v. Addyston Pipe & Steel Co., 85 F. 271, 282 (C. C. A. 6th, 1898). Moreover, this provision did not in fact operate as a real restraint of trade, since State had already obligated itself to Richfield to deliver to Richfield all of the oil at its plant.

Kelley, Maus & Co. v. Sibley, 137 F. 586, 591 (C. C. A. 7th, 1905) relied on by appellant, tends rather to support appellee. That case presents the converse of the present situation. There the defendant had already made a contract to buy from a third party when he contracted to deliver to the plaintiff the goods which he expected to receive under the first contract. The court asked: "Does an agent offer to sell to his principal the goods which he is employed to purchase? Can he act as agent for the proposing purchaser with respect to goods which he himself had contracted to purchase from another?" The court brushed aside the argument that the reference in the contract to the defendant's profit as a "commission" indicated an agency. Even less substantial is appellant's argument here that the reference to State's profit as "commission," in preliminary negotiations, shown by the parol evidence, indicated an intention to create an agency relationship. Furthermore, as the rejected evidence shows, State had the opportunity of realizing an additional profit through the difference in the gravity of the oil before and after dehydration and from the sale of oil extracted from the refuse of dehydration.

Appellant filed no exception to the allowance of the full amount of the claim without deduction of the value of the security, appellee's lien on State's claim against Richfield. The writer of this opinion, speaking for himself, alone notes this only to indicate that, in affirming the decree, he does not intimate any expression of opinion as to whether, in equity receiverships, at the present time, the old equity principle or one based on the statutory bankruptcy legislation is to be applied in determining the rights of a secured creditor. Cf. Johnson v. U. S., 163 F. 30, 32, 18 L. R. A. (N. S.) 1194 (C. C. A. 1st, 1908, Holmes, J.); U. S. v. Bouchard, 64 F.(2d) 482, 484 (C. C. A. 2d, 1933); Pound, Common Law and Legislation (1908) 21 Harv. L. Rev. 383, 385. See, as to national bank liquidation, Merrill v. National Bank of Jacksonville, 173 U. S. 131, 19 S. Ct. 360, 43 L. Ed. 640 (1899); see, too, American Surety Co. v. De Carle, 25 F.(2d) 18 (C. C. A. 9th, 1928); International Banking Corp. v. Lynch, 269 F. 242 (C. C. A. 9th, 1920); Washington-Alaska Bank v. Dexter Horton Nat. Bank, 263 F. 304 (C. C. A. 9th, 1920); Westinghouse E. & M. Co. v. Idaho Ry., L. & P. Co., 228 F. 972 (D. C. Idaho, 1915).

Decree affirmed.