No. 6388.

ABNER TAYLOR *v.* R. M. HALL, COMMISSIONER GENERAL LAND OFFICE.

1. VOLUNTARY PAYMENT—PROTEST.—A payment is generally held involuntary and recoverable by the payer when made to an officer who has power immediately to enforce the collection; but where such immediate authority does not exist the payment is not deemed compulsory. Nor does protest against it change its character if not in fact compulsory.

2. LAND OFFICE FEES.—The statute, section 2, act of March 25, 1879, provides a penalty for the failure to pay patent fees when the patents are ready for delivery. Upon suit to recover such penalty if the fees claimed are illegal no penalty could be enforced, and the Commissioner

of the Land Office having no power to enforce directly the payment of patent fees, the payment of patent fees claimed to be illegal would not be a payment under duress or compulsion.

3. DUTY OF COMMISSIONER OF LAND OFFICE AS TO FEES.—The Commissioner of Land Office is required to forthwith pay fees collected to the treasurer and a mere protest does not relieve him from the duty. Nor will it cast upon the Commissioner the responsibility of deciding at his peril a difficult legal question.

4. CHARACTER OF LAND TITLES CONTEMPLATED IN CAPITOL CONTRACT.—Following section 16, act of April 18, 1879, the contract for building the new capitol stipulated that the State agrees, covenants and binds itself to convey to the party of the second part (the contractor) the complete and perfect title to three million acres of land   *   *   "and it is expressly agreed   *   *   that the titles to said lands shall be made to the party of the second part by the Commissioner of the Land Office on the certificate of the Capitol Building Commissioners, to be countersigned and approved by the Comptroller as the work progresses and in installments as hereinafter set out." Construing this contract with the laws existing at the time of its execution *patents* were contemplated as the form in which the titles of said lands should be issued.

5. LAND OFFICE FEES FOR ISSUING PATENTS.—The fees of the Land Office are in the nature of an assessment made upon those who avail themselves of the services of its officers and employes and are provided for the purpose of making the land office self sustaining, as required by the State Constitution, article 19, section 1.

6. SAME.—Under a general law fees are charged upon all patents issued from the land office and there is no exception contained in the capitol contract or law under which it was made.

7. SAME.—Patent fees were properly collected of appellant upon patents issued to him under the contract by which he owned the lands.

APPEAL from Travis. Tried below before the Hon. A. S. Walker.

On the twenty-sixth of September, 1887, appellant instituted this suit in the district court of Travis county, Texas, to recover of and from appellee the sum of three thousand seven hundred and fifty dollars, which sum appellant alleged that appellee, as Commissioner of the General Land Office of the State of Texas, had illegally and unlawfully collected from him for the use and benefit of the State, as office fees for issuing and delivering to appellant patents to certain lands described in his petition, which lands and the patents thereto appellant alleged he was entitled to by virtue of his contract to construct the new capitol of the State. Appellant made the contract an exhibit to his petition.

Appellee answered by plea to the jurisdiction of the court, setting forth that the sum sued for by appellant had been collected by appellee in his official capacity as office fees for the use and benefit of the State, and paid into the State treasury, and that the suit was therefore, in effect, a suit against the State. Appellee also excepted generally and specially to the sufficiency of appellant's petition, and answered by general denial.

The court, after hearing the cause upon the pleadings and arguments of both parties, sustained appellee's plea to the jurisdiction, and also his general and special exceptions, and dismissed the case at appellant's cost, whereupon appellant appealed to this court.

This case involves the same facts with the case next following. The cases were submitted together and decided on same day.

*W. J. Swain* and *F. G. Morris,* for appellant.

*J. S. Hogg,* Attorney General, and *R. S. Harrison,* Office Assistant Attorney General, for appellee.

GAINES, ASSOCIATE JUSTICE. This action was brought in the court below by appellant to recover of appellee, who is Commissioner of the General Land Office, the sum of three thousand seven hundred and fifty dollars, alleged to have been paid under protest as patent fees for issuing patents to lands to which appellant became entitled by virtue of the contract with the State for building its capitol. Exceptions to the petition were sustained, and the suit was dismissed.

Two questions are presented by the appeal: First, can the appellee be held individually liable to pay back the fees paid by appellant under protest, even if they were illegally demanded? and second, was appellant entitled to have patents issued to him for the lands earned under the contract for building the capitol, without payment of such office fees as are required by law to be paid for patents in other cases?

After alleging the facts necessary to show the plaintiff's right to the patents issued to him the petition avers that the defendant, as Commissioner of the General Land Office, refused to issue them unless he paid the fees. The law is established that when a person, by the compulsion of the color of

.legal process, or of seizure of his person or goods pays money unlawfully demanded he may recover it back. It was held in Elliot v. Swartwout, 10 Peters, 137, that an importer, whose goods are retained by a collector of customs upon a demand for excessive duties, and the owner pays the duties under protest in order to procure the release of his property, he may hold the officer individually liable for the illegal charges so demanded and paid. So where a greater sum is charged by a carrier than he is entitled to, and has to be paid in order to get possession, the payment is not voluntary. (R. R. Co. v. Pattison, 41 Ind., 312; Tutt v. Ide, 3 Blatchford, 249; see also Cobb v. Charter, 32 Conn., 358; Clinton v. Strong, 9 Johns, 370.) The payment is generally held involuntary and recoverable by the payor, when made to an officer who has power immediately to enforce the collection. (R. R. Co. v. Wyandotte Co., 15 Kans., 587.) But when such immediate authority does not exist the payment is not generally deemed compulsory and the mere fact of protest does not change its character. (Phillips v. Jefferson Co., 5 Kans., 412; Detroit v. Martin, 34 Mich., 170; Benson v. Monroe, 7 Cush., 125; McMillan v. Richards et al., 9 Cal., 365; Mays v. Cincinnati, 1 Ohio St., 274.) The law upon this subject is thus summed up by a recent text writer: "And generally, it may be said, that when money not legally due is exacted from one to another, either under threats of violence or personal restraint, or by taking an undue advantage of him by detention of his goods, or by compulsion of legal process or by one who is clothed with power to collect it if it were in fact legally due, the payment is involuntary." (4 Wait's Ac. and Def., 491.) This further proposition is deducible from the authorities already cited, that a mere protest does not change the character of a payment not in fact compulsory and make it an involuntary payment. Protest, in cases where payment is made to an officer, is evidence that the latter had notice that the payor claimed that the demand was illegal and that he would sue to recover the money, and becomes material when it is sought to recover from the officer as an individual after he has paid it out in due course of the business of his office.

Recurring to the case made in the petition, the question arises, do the allegations show a compulsory payment by the plaintiff? These allegations are: "That fearing great damage to plaintiff for failing to take out patents or titles, and being threatened with heavy penalties for refusing to take title

papers from the Land Office of Texas, plaintiff was forced to pay, and did pay under protest, to defendant the sum sued for." What damage did plaintiff fear ?  If the averments of his petition are true, and if as a matter of law he was not chargable with the payment of the fees demanded, he had, in equity at least, a perfect title to the lands, which the State could not take away.  The patents were a more perfect evidence of title, and were doubtless convenient in making a sale of the land, but they were hardly more.  With what penalties was he threatened ?  Section 2, of the act of March 25, 1879, provides a penalty of ten per cent. per month for the failure to pay the patent fees upon lands when the patents are ready for delivery.  (Laws 1879, p. 61.)  The act cited makes it the duty of the Attorney General to bring suit for patent fees due the Land Office, which have not been paid after notice.  But the theory of plaintiff's case is, that he was not chargeable with patent fees; and if this were so, there existed no penalty for failing to take out his patent.  Was there any other constraint or compulsion ?  The Commissioner had no power to enforce directly the collection of the fees.  If he had had the immediate authority to levy upon the plaintiff's goods, and had so levied, or had expressly or impliedly threatened a levy, duress may possibly have been claimed.  But even if the Commissioner had the power to institute suit of his own motion (which may be doubted), there was no compulsion in this.  The plaintiff had a plain remedy by defending the action.  The Commissioner, upon receipt of the money, was bound to pay it over to the Treasurer; a mere protest did not relieve him from this duty. The plaintiff, not being coerced by any act of the Commissioner, could not, by a voluntary payment, shift upon him the responsibility of deciding, at his peril, a difficult legal question.

Upon these considerations we might well hold, that even admitting that that the fees were illegally exacted, the plaintiff can not recover; but waiving the question we have discussed, we must still sustain the ruling of the court below and affirm the judgment.

The contract for the construction of the capitol contains no express provision upon the subject of the patent fees, and we must resort to construction in order to determine the intention of the parties thereto.  The contract stipulates, that the State of Texas as the party of the first part, in consideration of the covenants, etc., on part of the party of the second part,

"agrees, covenants and binds itself to convey to the party of the second part, the complete and perfect title to three million (3,000,000) acres of land," (describing the lands) * * "and it is expressly agreed by the parties hereto, that the titles to said lands shall be made to the party of the second part by the Commissioner of the General Land Office, on the certificate of the Capitol Building Commissioners, to be countersigned and approved by the Comptroller, as the work progresses, and in installments, as hereinafter set out." The latter provisions follow the language of the act of April 18, 1879, which appointed the capitol commissioners and authorized them to make the contract. (See sec. 16, Act April 18, 1879; Laws 1879, p. 112.) If there could be any doubt of the proposition that the mode of making the titles and terms upon which they were to be made are governed by this statute, it is removed by a stipulation in contract which provides that the act cited shall be and remain a portion of "the contract in the same manner as if incorporated" therein. We must, therefore, endeavor to arrive at the intention of the Legislature. Was it intended that the Commissioner should issue patents, and if so, was the contractor to pay patent fees as in other cases? It is a rule in the interpretation of statutes, that all acts relating to the same subject matter may be considered. (Bryan v. Sundberg, 5 Texas, 418; Selman v. Wolfe, 27 Texas, 68; Poor v. Fowler, Dal., 401; Scoby v. Sweatt, 28 Texas, 713; Rix v. Loxdate, 1 Burr, 447; Bacon's Ab., title Statutes, 1, 2; Sedgwick on Stat. Const. Law, 247; Bishop on Statutory Crimes, sec. 86, and cases cited; The State v. Currie, 35 Texas, 18.) We must read the act in question in the light of former legislation; and this brings under consideration our legislative enactments from the days of the Republic down to this time.

By the act of Congress dated December 22, 1836, the general land office was established. (Hart. Dig., art. 1782.) The seventeenth section provided that all surveys legally made, etc., should "be patented" (Hart. Dig., art. 1798); and it was enacted by the eighth section that all patents issuing from the land office should be in the name of the Republic of Texas, and under the seal of the office, and should be signed by the President and countersigned by the Commissioner. (Hart. Dig., art. 1789.) The same provision, in substance, was re-enacted in the act of December 14, 1837. (Hart. Dig., art. 1843.) The law of fifth of May, 1846, provided that, in addition to pre-

vious requirements, the patent should also be attested by the
the seal of the State. (Pas. Dig., art. 4281.) This provision
was incorporated into the Revised Statutes, and remains the
law until the present day. (Rev. Stats., art. 3952.) Since the
passage of the act which established the general land office
and provided for issuing patents, no law has been passed
which recognized any other method of extending titles from
the State to those who acquired rights to specific portions of its
public domain. In order to acquire titles to land by virtue of
all headright, donation and bounty certificates, it was re-
quired that they, the certificates, should be located, the lands
surveyed, the field notes returned, and that patents should
issue. Also all land scrip sold was required to be surveyed
and patented. Even the owners of land in Webb and certain
other counties, who claimed under title emanating under the
former governments, and whose title had been recommended
favorably by the commissioners appointed under the act of
the eighth of February, 1850, were authorized by the act
which confirmed their title to have their lands surveyed and
patents issued therefor. (Pas. Dig., art. 4460.)

By the act of February 10, 1852, the State relinquished to
certain persons by name certain lands respectively claimed by
them under Spanish and Mexican grants, and the Commis-
sioner, upon a survey and return of field notes, was author-
ized and required to issue patents to the owners when titles
had been so confirmed. (Pas. Dig., art. 4462.) There is a like
provision in the similar act of February 11, 1858. (Pas. Dig.,
art. 4467.) The act of February 11, 1860, which provided for
the adjudication of certain claims for land between the Nueces
and Rio Grande rivers, also provided that upon the establish-
ment of the title in the district court that the Commissioners
upon the proper evidence of confirmation should issue patents
to those whose titles had been so confirmed. (Pas. Dig., art.
4489.) To the rule of authorizing patents to issue in case of
legislative confirmations or relinquishment there were a few
exceptions at a very early day. But we think the statutes above
referred to are sufficient to indicate a well defined policy on
the part of the Legislature to provide for patents to all lands,
the title to which were confirmed by or emanated directly from
the Republic or State. It would seem that the purpose was
not only to establish and maintain a uniform system for ex-
tending titles, but also by keeping duplicates of patents in the

land office to preserve a lasting monument of the government's grants.    Now, it is to be remarked that, although the laws have always required patents to be signed by the chief executive and countersigned by the Commissioners, it is made the duty of the Commissioner to issue the patents whenever the officer is named.    The act of May 9, 1838, which required the President and Commissioner to issue to the purchasers of lots on Galveston island is the only exception we have found.  (Pas. Dig., art. 4249.)

The difficulty we have had in construing the sixteenth section of the act to provide for the building of the capitol, grows out of the language, " title to the same shall be made to the contractor by the Commissioner of the General Land Office," etc.    We do not doubt that it was competent for the Legislature to have authorized the Commissioner alone to extend the title.    But, so far as we can see, this has never been done.  The uniform method of extending titles has been by issuing patents; and we had, when the act in question was passed, and still have, a general law which provides and regulates this mode of making titles to those who acquire a right to the public domain of the State.    We conclude that when the Legislature said that the Commissioner should issue titles to the contractor, it was meant that he should procure, sign and issue patents, as required in other cases of acquisitions of the public domain by individuals or corporations.    The plaintiff procured patents in this case, from which it appears that he places the same construction upon the law and his contract made under it which we do.    But we have endeavored to show clearly that this is the true construction, because upon it. depends, in our opinion, the question whether he is chargeable with the fees of the land office or not.

If he was entitled to recover patents in the sense in which that word is used in the statutes, then we think he was bound to pay the patent fees.    At the time the act in question was passed, there was, and there still is, a general provision in the Revised Statutes which authorized and required the Commissioner of the General Land Office " to charge for the use of the State" certain fees for issuing patents for land (Revised Statutes, article 2376); and by an act passed on the previous day of the same session, it was provided that the patent fees should be a lien on the lands; that individuals and corporations entitled to patents, who should fail to pay the fees at the expira-

tion of sixty days after notice, should be subject to a penalty of ten per cent. per month on the amount; and that the Attorney General should bring suit on behalf of the State to collect the fees. The Constitution provides that, "it shall be the duty of the Legislature, at the earliest practicable time, to make the land office self sustaining." (Constitution 1876, article 19, section 1.) The fees of that office are in the nature of an assessment made upon those who avail themselves of the services of its officers and employes, and are provided for the purpose of carrying into effect the constitutional provision which we have quoted.

A general law was passed in 1860, which required the Commissioner to charge fees on all patents. (Pas. Dig., art. 3836.) This was repealed by a similar law passed June 2, 1873, which charged larger fees for the same services. (Pas. Dig., art. 6844a.) The latter act was substituted by the present provision in the Revised Statutes. The language of all these enactments is general and applies to all patents. In no law since passed, so far as we have been able to find, has any grantee been relieved from the duties of paying the office fees upon receiving his patent; although since the passage of the first act laws have been in force authorizing the sale of land scrip to be located upon the public land, as well as other acts providing for the acquisition of land by purchase after obtaining a right of pre-emption. The patent fees are, therefore, not a mere tax upon those who have secured the bounty of the State, but are also a charge upon all patentees, whether they have acquired their rights by the bounty of the government or by purchase or other contract.

The case before us then presents itself in this way: The Legislature authorizes the Capitol Board to contract to convey the lands set apart for the purpose of building a State capitol to a contractor, in consideration of his constructing the building, and authorizes the Commissioner, upon the completion of the contract, to issue patents to the land. Under the law as it then existed a certain fee must be paid before any patent can issue. The patents which are to issue are not expressly excepted from the operation of the act. We think, therefore, the presumption is that they were not intended to be excepted, but were to be charged upon the patents issued under the act in question as in all other cases. In case of The Railway Company v. Gross, 47 Texas, 428, the railway company was granted

certificates, by an act which did not specify that they were to be conveyed in alternate sections; but there being a general law requiring certificates issued to such companies to be so surveyed, it was held the two acts must be construed together, and that the certificates should be surveyed and located as other railroad certificates. The fourth section of the act under consideration authorizes a sale in any event of a sufficient amount of the land to pay the expenses of surveying, etc. From which it appears that the Legislature intended, as did the framers of the Constitution, that the entire expense of constructing the capitol should be paid for by the lands. The contract was evidently made in pursuance of the same policy. It stipulates that the contractor shall pay the State the sum of twenty thousand dollars, in order to reimburse it for the outlay then incurred in surveying the lands, etc. It was in consonance with the same policy that the contractor should pay the patent fees, to the end that the expense necessarily incident to the preparation of the patents should not become a charge upon the general funds of the land office or of the State.

We conclude that the act which authorized the contract for building the capitol provided that patents should issue for the lands earned under it; that it did not expressly or impliedly make the patents to be issued an exception to the general law of the State, that all patentees must pay fees for the patents issued to them; and that therefore the fees sued for in this case were rightfully demanded by the Commissioner.

There is no error in the judgment, and it is affirmed.

*Affirmed.*

Opinion adopted June 15, 1888.

[Associate Justice Walker not sitting.]