**TEXAS CO-OP. INV. CO. v. CLARK et al.**
**(No. 243-3437.)**

(Commission of Appeals of Texas, Section B.
March 29, 1922.)

**1. Corporations ⊚⇒78—Breach by corporation of subscription contract held not to relieve subscriber from liability on another independent contract.**

The refusal of a corporation to issue stock to a subscriber, even though actually paid for by the latter, did not discharge such subscriber from the obligation to complete payment on a previous unrelated stock subscription contract made by such subscriber with such corporation.

**2. Husband and wife ⊚⇒86—Married woman bound on subscription contract in which husband joins.**

A married woman is bound by a stock subscription contract made by her jointly with her husband, even though executed prior to the taking effect of the acts of 1913 and 1917, changing the law with reference to the management of the separate estate of the wife.

**3. Husband and wife ⊚⇒90—Married woman cannot recover payments made on contract.**

A married woman, even though not bound, because of coverture, by a stock subscription contract executed by her, cannot recover a payment thereon, voluntarily made by her.

**4. Corporations ⊚⇒408—Not bound by personal guaranties of agent.**

A corporation is not bound by personal guaranties of its agent, made without the scope of his authority and unauthorized by the corporation, in inducing a subscription to its stock.

**5. Corporations ⊚⇒408—Unauthorized guaranty by agent inadmissible against corporation.**

In an action by a subscriber against a corporation to recover payments made on stock subscribed for, evidence of personal guaranties made by its agent without the apparent scope of his authority and unauthorized by the corporation is inadmissible.

**6. Appeal and error ⊚⇒1173(2)—Judgment not disturbed as to defendant not appealing.**

A judgment of the Court of Civil Appeals cannot be disturbed as to a codefendant who has not joined with his coparty in the application for a writ of error therefrom.

Error to Court of Civil Appeals of Second Supreme Judicial District.

Action by Mrs. M. A. Clark and her husband, James Clark, against the Texas Co-operative Investment Company and the Texas Organization Company. From a judgment of the Court of Civil Appeals (216 S. W. 220), affirming a judgment for plaintiffs, defendant Texas Co-operative Investment Company brings error. Affirmed as to defendant Texas Organization Company, and reversed and remanded as to defendant Texas Co-operative Investment Company.

See, also, 212 S. W. 245, 235 S. W. 973.

Capps, Cantey, Hanger & Short and Phillips & Trammell, all of Fort Worth, for plaintiff in error.

I. W. Stephens and D. W. Odell, both of Fort Worth, for defendants in error.

POWELL, J. This action was brought in the district court of Tarrant county, Tex., by Mrs. M. A. Clark and her husband, James Clark, to recover $4,500, alleged to have been paid by her on certain subscription contracts for stock of the Texas Co-operative Investment Company, with legal interest from the date of payment. The plaintiffs in the trial court not only named said Investment Company as a defendant, but also the Texas Organization Company, which latter corporation acted as agent in selling the stock of the former. In the alternative, the plaintiff prayed for a judgment against the Investment Company for the issuance of stock in said sum of $4,500, and payment of dividends, if any, which said stock would have earned since same was paid for, and had the same been issued.

The basis of this suit was alleged fraud in the procurement from Mrs. Clark of her subscriptions to said stock. The petition alleged that the Investment Company, an Arizona corporation authorized to do business in Texas, had conspired with the Texas Organization Company, a Texas corporation, to go out among the people of Texas and defraud them into taking stock in the Investment Company; that in pursuance of the common design, and of such conspiracy, one Homer Peeples, as agent for the Organization Company, which was itself an agent for the Investment Company, made numerous false representations to Mrs. Clark, and thereby induced her to make the subscription contracts, and sign the same even without reading them.

The defendant companies answered by general and special exceptions and general denial, as well as other pleas unnecessary to mention. A trial was had before a jury, which returned its verdict, in response to a general charge, awarding Mrs. Clark judgment against both defendants for $6,268.50, with legal interest from that date. This was in fact a verdict for the $4,500, as sued for, together with interest from the date of its payments to the date of the trial. Judgment was entered accordingly.

The defendant companies appealed to the Court of Civil Appeals at Fort Worth, where the judgment of the trial court was in all things affirmed. See 216 S. W. 220. In due time, application for writ of error was filed in the Supreme Court by the Investment Company alone, and the same was granted.

⊚⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Before entering into a discussion of the legal propositions involved in this appeal, it may be helpful to go more fully into the facts which bear upon said legal questions to be hereinafter discussed. The Investment Company, as its name implies, was a corporation organized to deal in investments. It was duly chartered under the laws of Arizona, and authorized to do business in Texas. The Organization Company, as its name also implies, was incorporated under Texas laws to sell the stock of other corporations, including the Investment Company above mentioned. The only connection between the two companies consisted in the fact that they had certain stockholders in common, and the further fact that the companies entered into a written contract with each other, under which the Organization Company, for a commission stated, agreed to sell the stock of the Investment Company to the public.

The Organization Company sent out one Homer Peeples to sell that stock. Mrs. Clark was well known to Claude Hays, who was connected with both companies. Peeples, armed with a letter of introduction from Hays, sought out Mrs. Clark, and, after considerable negotiations at different times, he procured two subscription contracts from her, which no one denies. The first of these was dated June 29, 1911, and was for 200 shares of stock, at $10 each. Five hundred dollars of the consideration was paid in cash, and three notes, for $500 each, were executed in payment of the balance of the stock. In addition to the notes, a subscription contract was signed by the purchaser, which was plain and unambiguous. Among other provisions of that contract we find the following:

"The sum of five hundred ($500) dollars I hereby agree to pay and do pay, in consideration of the agreement of said Texas Organization Company, concurrently with this subscription, in lieu of any further or other contributions to the expense of organizing, incorporating, or disposing of the stock of said Texas Cooperative Investment Company. The remaining sum of fifteen hundred ($1,500) dolars I agree to pay in the following installments, namely: $500.00 on or before the 1st day of October, 1911; $500.00 on or before the 1st day of April, 1912; $500.00 on or before the 1st day of October, 1912—as evidenced by my three promissory notes of even date herewith in favor of the Texas Organization Company, Inc., of Fort Worth, Texas, and I do hereby agree for said stock to be held at Fort Worth, Texas, by the Bankers' Trust Company, Inc., as trustee for the said Texas Organization Company, as security for balance due, said stock to be delivered to me promptly when fully settled for.

"I further agree, should I desire an extension of time on any or all of the above-mentioned notes, to furnish other security satisfactory to the Texas Cooperative Investment Company, either in lieu of the stock or additional thereto. I further agree, in consideration of the agreement of the said Texas Organization Company, should I fail or refuse for a period of thirty (30) days after any one of the above notes matures to fully settle same or make satisfactory arrangements with the said company or its assigns for extending same, that the holder of said note or notes may at his option, mark them canceled, cancel this subscription, and declare all payments made hereon forfeited as liquidated damages."

The second purchase of stock by Mrs. Clark came early in July, 1911, and was for 800 shares, aggregating $8,000. One-fourth of the latter amount was paid in cash, and three notes executed for the balance. The trade was closed with notes and a subscription contract similar in all respects to the one above quoted. The books of both defendant companies showed the above two transactions, and the payment of a total of $2,500 by Mrs. Clark was admitted by all the parties.

The real controversy arose over the alleged stock subscription in the sum of $2,000, made late in August, 1911. Mrs. Clark claims she bought $2,000 more of this stock at that time from Peeples; that she gave him two notes, for $1,000 each, in payment thereof. She does not even claim she signed any stock subscription contract at that time. Peeples denied the notes were given in payment of any stock. He says she had already purchased $10,000 of this stock, and no more could be directly sold to her; that he agreed to help her get $10,000 more through others; that she finally decided not to buy this additional stock, and gave him $2,000 in notes to be released from the obligation to take this extra $10,000 of stock, which he was to get for her as an independent contractor. Unhappily, there is no written evidence of the terms of this $2,000 deal. The evidence shows that Peeples issued a receipt in duplicate for these notes. Mrs. Clark kept one and he the other. These receipts would have shown what the trade actually involved, but Mrs. Clark's copy was lost by her lawyers. Peeples said he thought his copy was somewhere in Tennessee. So these matters became controverted questions of fact between Mrs. Clark and Peeples.

While the terms of the $2,000 deal were sharply in dispute, all of the evidence showed that neither company ever received any benefit therefrom, and Peeples denied to them, when they wrote him, upon complaint of Mrs. Clark, that she had ever paid him anything in August for stock. The evidence is rather convincing that Mrs. Clark would have paid out her first two stock contracts, if the Investment Company would have allowed her credit for the $2,000 she claimed to have paid in August to their agent, and which their agent denied was in payment of any stock. The companies declined to allow any such credit. Mrs. Clark refused to pay the notes given in payment of the first two subscription contracts. Finally, in July,

1913, in exact accordance with the terms of said contracts she had signed, the Investment Company canceled her notes and retained the $2,500 as liquidated damages.

[1] The issues of fraud in the procuring of the aforesaid subscription contracts were fully submitted to the jury by the court. Certain special charges asked by the defendant companies were declined. We think the Court of Civil Appeals correctly decided the assignments of error in that connection, and that the judgment of the trial court would have properly been affirmed, but for the giving of special charge No. 2, requested by Mrs. Clark, and which reads as follows:

"If you fail to find for the plaintiff, M. A. Clark, on the issue of fraud submitted to you in the charge of the court, but find from the evidence that Homer Peeples was the agent of defendants, or was held out as such by said Claude C. Hays, as general manager of said companies, and that as such agent he induced her to purchase and pay for the stock in said Investment Company at or about the dates alleged in June, July, and August, 1911, and that she dealt with him in each of said transactions as the agent and representative of defendants, believing that he was such agent, and that defendants refused to give her credit for the sum of money, if any, paid on said August subscription, and declared a forfeiture of the moneys paid on said June and July subscriptions, and that on this account said plaintiff refused to make any further payments, you will find for her the sums paid, if any, on said June, July, and August subscriptions, with interest at 6 per cent. per annum from October 1, 1911."

The Court of Civil Appeals practically concedes the above charge to be erroneous, but affirms the judgment of the trial court by saying that the charge in question contained no *prejudicial* error. In this holding we cannot concur. In the first place, these stock subscriptions were each and all separate contracts. Neither was dependent upon the other, and under no line of reasoning could we justify the special charge given to the jury. The same eliminates the fraud issue, and authorizes recovery independent thereof. If there was no fraud, then we must assume that these contracts were valid and legitimate, and voluntarily assumed. If so, they must be executed according to their express terms. And yet, under the special charge in question, the jury was authorized to render judgment for the $2,500 paid in on the June and July subscription contracts, just because the Investment Company had refused to issue stock for the $2,000 paid in August, and concerning which there was a most vigorous dispute. No contract was executed for this $2,000; but she claims to have paid this money all in cash, or its equivalent, and the stock was to be issued at once. A failure to issue that stock could not affect the terms and conditions of the June and July contracts, in any event. In this connection, the Court of Civil Appeals says:

"It is clear that the Investment Company had no right to refuse, as it did do, to issue stock actually paid for in August. At all events, plaintiff was entitled to this stock, and the refusal of the company to issue it to her amounted to a sufficient cause, we think, for her refusal, if any, to make further payments on her June and July subscriptions."

We cannot agree to this statement. There was no connection between the August contract and those of June and July, and no failure of the company in connection with the August contract could be held to affect the rights of the parties under those of June and July. As we view the record in this case, there was no breach of these June and July contracts, and, if they were not tainted with fraud, they should be enforced in accordance with their express terms, and independent of the August transaction.

Again, said special charge is fatally defective, in that it authorizes a recovery of judgment for $4,500. In view of her contracts signed in June and July, which she had unquestionably breached, she would have been entitled to nothing thereon. Under the undisputed facts of this case, in the absence of fraud, as provided in the special charge, the recovery of a money judgment for $4,500 is not authorized by law. Said special charge should not have been given to the jury. It is clearly erroneous, and, we think, requires a reversal of the judgment of the trial court.

[2] But, regardless of said special charge, the Court of Civil Appeals says that it appears from the record that, at all times herein involved, Mrs. Clark was a married woman, and could not be bound by her subscription contracts. That court admits it may be mistaken in that view, and we think it is. These contracts in June and July, 1911, were executed prior to the taking effect of the acts of 1913 and 1917, under which the Texas Legislature made radical and far-reaching changes in the law with reference to the management of the separate estate of the wife. In 1911, under the statutes then in force, the husband, during the marriage, was vested with the sole management of the wife's separate property. If the record discloses that the husband and wife jointly made these contracts, then it is absolutely immaterial, in any event, that Mrs. Clark was a married woman at the time.

[3] But, even if it shall appear that Mrs. Clark's husband did not join in these contracts, what do we find to be the legal effect of her alleged coverture disability? The law, in this respect, in 1911, seems to be well settled. If the subscription contracts were not fully binding upon Mrs. Clark because of her coverture, she would still not be authorized, from that fact alone, to recover payments she had made. This is clearly ruled by the Supreme Court of Texas in the case of Pitts v. Elsler, 87 Tex. 347, 28 S. W. 518.

We quote from Justice Brown's opinion in that case, as follows:

"'In this case we deem it proper to certify for decision the question whether a married woman, who has purchased personal property and paid part of the purchase price cash, and promised to pay the balance at a day specified in the future, at which time, upon the payment being made, the vendor is to deliver the personal property to her, can, before the time for the deferred payment and delivery arrives, avoid the contract and recover back the cash payment made, on the ground of coverture?' We answer that under the facts stated a married woman cannot, solely on account of her coverture, recover the payment made. Where money is voluntarily paid, with full knowledge of all the facts, it cannot be recovered, although it may have been paid upon a void demand, or upon a claim which had no foundation in fact. Taylor v. Hall, 71 Texas, 216; Gould v. McFall, 118 Pa. St. 455; 4 Am. St. Rep. 606. This proposition is too well settled to require further citations of authority. A married woman, who voluntarily pays her money or other personal property upon a contract made by her or in any way that would bind a man, cannot recover it back simply upon the ground that she is a married woman. Sellmeyer v. Welch, 47 Ark. 485; Gillespie v. Simpson, 18 S. W. Rep. (Ark.) 1050; Gould v. McFall, 118 Pa. St. 455; Johnson v. Jones, 51 Miss. 860.'"

In the opinion just quoted from, Justice Brown further significantly states:

"In this state the right of a married woman to acquire and hold property, real and personal, either by gift, devise, descent, or *purchase*, is as absolute as that of her husband."

Under this last decision, even if the subscription contracts of June and July are not fully binding on Mrs. Clark because she was a married woman at the time of their execution, she would still have no right to recover back the money she had paid, solely on account of her coverture. She had voluntarily paid her money for stock, and even though there was no contract for deferred payments binding upon her, she could not recover the money she had paid without executing her contract. In fact, we think the authority last quoted from is a complete answer to the alleged coverture disability in this case. Under it, even though her husband had not joined directly or indirectly in these contracts, her status was this: She could not be compelled to carry out the contracts and make the deferred payments. But if she elected not to do so, she would relinquish the cash payments already made and her claim to any stock. She was put upon her election as to which was best for her; to go on and make the payments as per the terms of the contract, or forfeit the payments already made, and be relieved of any obligation on the notes still due. In other words, the rule laid down in this last authority accorded Mrs. Clark the same rights that she

contracted with the company it might have at its option; that is, she could either pay according to the contract, or be relieved of further payments by forfeiting the former payments. In this very connection, Judge Brown, in the case of Pitts v. Elsler, supra, says:

"Mrs. Pitts had the right to refuse to receive the property and could not be compelled to complete the unexecuted part of the contract; but when she elected to abandon the trade she must determine for herself, as if she were a man, whether it was to her advantage to refuse to proceed, and having so decided, she has only such remedies as a man would have had under the same state of case. * * * If she is damaged by the result, she had it in her power to have protected herself by paying the remainder of the price and taking the goods, and if the property purchased was not in her opinion of sufficient value to justify this, she has the advantage, over a man, of abandoning the contract and escaping responsibility for other damages than the sum advanced."

In view of what the Supreme Court has said in the case last quoted from, we do not see how any one could contend that, in the absence of fraud, Mrs. Clark could have been entitled, in any event, or under any theory, to recover the money judgment as authorized by her special charge No. 2, which was given by the court.

For the reason discussed, it will be seen that the coverture of Mrs. Clark does not render immaterial the errors in special charge No. 2.

[4, 5] The other assignments of error here presented, question the correctness of the trial court's rulings on the admissibility of certain testimony. Near the top of the first column on page 222 of 216 S. W., the Court of Civil Appeals disposes of these assignments. We can add nothing to the holding of that court, except to say that we think it is, in the main, correct. We differ with their holding only to the extent of thinking that the personal guaranties of Agent Peeples should not have been admitted in evidence against the defendant companies. No express authority from either of the companies to him to make such guaranties was shown. Under those circumstances, we do not think the companies would be bound by any such representations, as they are not within the apparent scope of this agent's authority. In fact, the trial court, in the case at bar, charged the jury to find for the defendant companies, if Mrs. Clark was induced to contract as she did solely because of Peeples' representation that he would guarantee 10 per cent. dividends from the start. We think that charge, eliminating the effect of that testimony, was correct. The Court of Civil Appeals seems to agree with our conclusion in this respect, in discussing aforesaid charge of the court.

It follows, from what has been said, that

we are clearly of the view that the trial court erred in giving special charge No. 2 aforesaid, to the jury, and that such error should require a reversal of this case.

[6] As the Texas Organization Company did not join in the application for writ of error, the judgments of the lower courts, so far as it is concerned, are binding and cannot be disturbed. Said Company has sought no relief here.

Therefore we recommend that the judgments of the district court and Court of Civil Appeals, in so far as they affect the Texas Organization Company, be affirmed, and that said judgments be reversed in so far as they affect the Texas Co-operative Investment Company, plaintiff in error herein, and that the cause, as to the latter company, be remanded to the District Court for a new trial, in conformity with our views herein expressed.

CURETON, C. J. Judgments of the district court and Court of Civil Appeals as to Texas Organization Company affirmed, and reversed as to Texas Co-operative Investment Company, and cause as to latter company remanded to the district court for a new trial.