**STATE v. PERLSTEIN et al.**

No. 8132.

Court of Civil Appeals of Texas. Austin.

Oct. 31, 1934.

Rehearing Denied Jan. 9, 1935.

James V. Allred, Atty. Gen., and Pauline R. Frank and F. O. McKinsey, Asst. Attys. Gen., for the State.

Howth, Adams & Hart and A. Milton Vance, all of Beaumont, for appellees.

BLAIR, Justice.

This litigation arose as follows:

The state of Texas owned the "State Iron Industry," consisting of a blast furnace, pipe plant, and foundry, located on 123 acres of land owned in fee by the state, at the Rusk Penitentiary, together with about 6,000 acres of iron ore leases near the plant. For several years prior to 1917, the plant had not been operated, and had become dilapidated, parts removed, and a fire had damaged it. April 2, 1917, by H. C. R. No. 22, 35th Legislature (Acts 1917, p. 499), the board of penitentiary commissioners, with consent of the Governor and Attorney General, were "requested to sell * * * said property * * * on such terms as will justify the purchase, rehabilitation and operation * * * to any person * * * who will agree and give a good and sufficient bond in the sum of one hundred thousand ($100,000.00) dollars to take, pay for, rehabilitate and put in operation the blast furnace, the cast iron pipe plant, and the foundry * * * within a reasonable time from the date of the sale thereof, and to operate said industries for at least one full year." The sale was to include land needed for the plant, but not "the Rusk Penitentiary, its buildings, grounds, and present prison industries, nor such lands as may be needed or wanted for other purposes." Accordingly, the properties were duly advertised and sold to L. P. Featherstone, acting for the Texas Steel Company, for $112,500 and 50 cents per ton for the iron ore in the leases, to be paid for as used. December 2, 1917, a written contract for the purchase of the properties was executed, which provided that the deed would be delivered when purchaser made the required bond of $100,000, and paid one-fourth of the purchase price; and further provided that the remainder of the purchase price be paid one-fourth in one year, one-fourth on or before eighteen months, and one-fourth on or before two years from date of contract. January 8, 1918, Featherstone paid $5,000 as earnest money, to be applied on purchase price if the sale was completed, otherwise to be forfeited.

The Texas Steel Company took possession of the properties and expended about $100,000 for repairs; and in April, 1919, put the blast furnace in operation and operated it for about three months. By H. C. R. No. 43, dated March 15, 1919, the 36th Legislature (Acts 1919, p. 380) recited that Featherstone had "deposited $5,000.00 as earnest money," and had made improvements "to the amount of approximately $100,000.00," but had not made the bond nor paid the first installment as required by the purchase contract; and extended the time for making the bond and first payment to July 1, 1919. By H. C. R. No. 11, dated July 16, 1919, the Legislature (Acts 1919, 1st and 2d Called Sess., p. 460) again extended the time for making the bond and first payment to January 1, 1920, reciting that "said L. P. Featherstone has expended more than $100,000.00 in rehabilitation and improvement of said property," but had closed the plant temporarily on account of unfavorable freight rates made under the Federal Administration of Railroads. In October, 1919, the Texas Steel Company was placed in the hands of a receiver.

March 16, 1920, the prison board, with the consent of the Governor and Attorney General, executed and delivered a deed to the property to L. P. Featherstone, who on the same date executed the $100,000 bond with appellees, or those whom they represent, as sureties, conditioned as provided for by the resolution and the purchase contract. On the same day appellees personally raised $23,125, which was delivered to the receiver, and which together with the $5,000 earnest money was paid by him as the first payment on the purchase contract. And on the same day Featherstone executed and delivered to the prison board his three notes of even date with the deed, each for $28,125; note No. 1 due one year, note No. 2 due eighteen months, and note No. 3 due two years after date, and bearing 6 per cent. interest. The deed was without warranty, and recited that no vendor's lien was retained. As security for payment of any amounts on account of their liability on the bond, appellees were to receive receiver's certificates, which under order of the court were to constitute a first lien on the property; and, as additional se-

curity, Featherstone executed a deed of trust on the property to appellees, and then deeded the property to the receiver of the Texas Steel Company, without warranty, and in consideration of the assumption of the performance of his contract with the state. Beginning about April, 1920, the receiver operated the blast furnace for three months; and for these and other expenses appellees advanced funds to the receiver until they held his certificates, taken at 66⅔ cents on the dollar, in an amount in excess of $100,000.

March 16, 1921, appellees paid direct to the prison board $28,125.00 principal, and $5,062.50, interest, in payment of note No. 1, and all interest due to that date. A Senate Resolution of the 37th Legislature, and an agreement of the parties, dated October 26, 1921, extended the time of payment of notes Nos. 2 and 3 to September 16, 1923, and March 16, 1924, respectively; and March 16, 1922, the appellees paid the prison board $3,375, the accrued interest to that date on the balance of the unpaid purchase price.

December 18, 1922, under orders of the court, and after due advertisement and sale, the receiver deeded the property to John L. Keith, as trustee for appellees; the consideration being the surrender of receiver's certificates of the face value of $97,121.08, and $27,878.92 cash, and the receiver also sold all accounts, notes, and claims receivable of the Texas Steel Company to the trustee. The receiver's deed was without warranty, and provided that purchasers would perform all conditions of the order of sale and would assume all the obligations of Featherstone as provided in his contract and bond to the state.

After receiving the deed from the receiver, appellees paid interest on the two remaining purchase-money notes as follows: March 16, 1923, $3,375; March 16, 1924, $3,375; March 16, 1925, $3,375; and December 29, 1926, $1,687.50, which last payment was claimed by appellees to have been made under some sort of compromise agreement with the board of managers of state properties, created by the 39th Legislature, by which the two remaining notes were to be canceled upon appellees' deeding 17½ acres of the land back to the state for insane asylum purposes, and putting the blast furnace in operation; but which agreement was not approved by the Legislature, and was never carried out.

After appellees purchased the property they did not attempt to operate the plants in any manner; but upon the advice of engineers, who found that most of the state leases did not contain iron ore in paying quantities, appellees purchased 8,000 acres of ore leases at an approximate cost of $100,000, which leases were claimed to be necessary to the future operation of the industries.

September 13, 1927, the state by its Attorney General filed suit against appellees, or those whom they now represent, on the two remaining purchase-money notes and the bond, the action being one for debt, no lien being asserted against the properties in question. Appellees answered, setting up the claim that H. B. No. 451, Acts 35th Legislature (chapter 198), approved April 4, 1917, providing for the establishment of the East Texas Hospital for the Insane, authorized the committee named therein to select the site for such hospital on the property known as the State Iron Industry; that since this act was approved two days after the approval of H. C. R. No. 22, under which the prison board purported to act in selling the said State Iron Industry to Featherstone, the subsequent act superseded the former H. C. R. No. 22; and that therefore the deed to Featherstone was void and passed no title to the property; and pleaded failure of consideration for the purchase money notes and the bond executed by appellees to secure the payment of them. Prayer was that the state take nothing by its suit, and in the alternative that the suit be stayed until the state furnished good title to the property. Appellees also set up by cross-action that upon the rescission of the conveyance and cancellation of the notes and bond they would be entitled to a return of the purchase money paid by them and their predecessors to the contract. By supplemental petition the state again asserted the validity of the conveyance and sought to collect its debt, and, in the alternative, alleged that if the consideration for the notes and bond had failed, then that the deed be canceled, and that the title to the property be vested in the state. The state excepted to the cross-action to recover the purchase money paid, because appellees had not been granted permission to sue the state.

July 22, 1929, final judgment was entered in said cause, which recited, "that the law and the facts are with defendants and that prayer for the cancellation of the bond and notes should be granted and sustained"; and further recited that the law and facts are with the state "wherein in the alternative it prays for the cancellation of the deed to L. P. Featherstone." The judgment accordingly decreed that the state take nothing by its suit against appellees on the notes and

bond; but that the state have judgment canceling the deed and quieting title to the property known as the State Iron Industry. The judgment further recited that the court had no jurisdiction to litigate the claim of appellees arising from the payment of the purchase money; but that "this judgment is entered without prejudice to the claim of defendants."

The judgment was not appealed from, and became final. Thereafter the state took possession of the land and has continuously used it, or a part of the land, for the East Texas Hospital for the Insane.

Appellees instituted this suit under authority of H. C. R. No. 19 (Acts 1933, p. 924), approved March 20, 1933, setting up the facts substantially as above detailed, but with greater particularity, and prayed for the recovery of $76,500 paid as purchase money and interest to the state on the property; for $100,000 as improvements placed on the land; and for about $20,000 for taxes paid to state, county, city, and school district during the time appellees and their predecessors occupied the property. The state answered by general demurrer, general and special denial, special pleas of estoppel and ratification, and by cross-action sought to recover for rentals, parts of the plant sold by appellees, and other items. By supplemental petition appellees pleaded the former judgment as res adjudicata of the defenses set up by the state, and pleaded estoppel on the part of the state to urge such defenses.

The trial to the court without a jury resulted in judgment for appellees for the purchase money and interest paid, totaling $76,-500; for $50,000 for the enhancement of the value of the property by reason of the improvements as of date of the judgment in the prior suit; and for $4,624.71 for taxes actually paid into the state treasury. The state was allowed as offsets items aggregating $38,-934.22; and, striking a balance between the awards, the court rendered judgment for appellees against the state for the sum of $158,-066.33, with interest from date thereof at 6 per cent. on $93,881.35 of said amount; hence this appeal by the state.

All parties concede that the judgment of July 22, 1929, decreeing that the title to the State Iron Industry did not pass by the deed from the prison board to L. P. Featherstone, and that the deed was wholly unauthorized and void, and decreeing its cancellation, finally determined and is res adjudicata of such matters as between the parties to this suit. This being true, and since the deed was de-

clared to be void because the officers executing it had no authority in law to do so, no legal obligation was imposed on the state when the deed was canceled and the property repossessed, to return the purchase money paid, or to pay for the improvements placed on the property, under the rule that "public officers have and can exercise only such powers as are conferred on them by law, and a state is not bound by contracts made in its behalf by its officers or agents without previous authority conferred by statute or the constitution." 59 C. J. 172. And since no legal obligation was imposed on the state by virtue of the cancellation of the unauthorized contract and deed of its officers, who, according to the former judgment, had no authority in pre-existing law to execute them, the judgment allowing the recovery of such claims is in violation of article 3, § 44, of the Constitution, which provides that: "The Legislature * * * shall not grant * * * by appropriation or otherwise, any amount of money out of the Treasury of the State, to any individual, on a claim, real or pretended, when the same shall not have been provided for by pre-existing law." Nichols v. State, 11 Tex. Civ. App. 327, 32 S. W. 452, writ refused; State v. Haldeman (Tex. Civ. App.) 163 S. W. 1020, writ refused; State v. Wilson, 71 Tex. 291, 9 S. W. 155; Austin National Bank v. Sheppard (Tex. Com. App.) 71 S.W.(2d) 242.

But appellees say that although no legal obligation was imposed on the state when the deed was canceled and the property repossessed, to return the purchase money paid, or to pay for the improvements placed on the property, still a moral obligation to do so was imposed in virtue of the premises above stated. That is, appellees contend that since the officers executing the deed had the apparent authority to do so under H. C. R. No. 22, and since the state by alternative plea in the former suit obtained judgment canceling the deed, and thereafter repossessed the land, a moral obligation was thereby imposed on the state to return the purchase money paid, and to pay for the improvements placed on the property. Appellees further contend in this connection that the resolution authorizing the suit to recover such claims did not create the moral obligation of the state to pay them, but merely recognized the existence of such moral obligation, and provided a remedy for its enforcement; and that the judgment allowing a recovery of such claims is, therefore, not in violation of the aforementioned provisions of the Constitution inhibiting the appropriation of money to an individual where his claim has not been provided for by

pre-existing law. In support of these contentions, appellees cite and in the main rely upon the case of Kilpatrick v. Compensation Claim Board (Tex. Civ. App.) 259 S. W. 164, which seems to hold that a mere moral obligation will authorize an appropriation by the Legislature if the same arose prior to the granting of the authority to sue the state.

■ We are clear in the view that no moral obligation was imposed on the state to return the purchase money paid, or to pay for the improvements placed on the property, in virtue of the premises stated. No discussion of this conclusion is necessary, however, because since the trial and appeal of this case, the Commission of Appeals, by its opinion in the case of Austin National Bank v. Sheppard, 71 S.W.(2d) 242, 245, expressly overruled the holding in the Kilpatrick Case, and held that a mere moral obligation of the state will not support an appropriation by the Legislature of state money to an individual, in view of the aforementioned constitutional provisions inhibiting such appropriation, unless there is already in force a law which makes the claim a "legal obligation of the State." In the Austin National Bank Case and the companion case of Corsicana Cotton Mills v. Sheppard, 71 S.W.(2d) 247, the commission reviewed all the authorities hereinabove cited, and concluded that in its opinion none of the cases, except the Kilpatrick Case, "support the holding that a mere moral obligation will support an appropriation of state money to an individual." These cases are conclusive of the questions that although the state received the benefits of the unauthorized contracts of its officers, or received unauthorized taxes voluntarily paid into the treasury, the Legislature cannot appropriate money to repay such claims, because of the constitutional inhibitions aforementioned; and these cases preclude the judgment in favor of appellees in the instant case.

■ Nor is there any merit to the point of appellees that this suit does not involve an appropriation, but only involves the right of appellees to recover judgment in the premises, under the resolution authorizing this suit to be filed. The judgment would be worthless without an appropriation to pay it; and if it had been upheld, there is no doubt but that the Legislature would have appropriated money to pay it. It is manifest that by the resolution authorizing this suit appellees were authorized to litigate their claim in a court of competent jurisdiction; the Legislature intending to abide the decision in the premises. And since it is clear that an appropriation for the claims before the judgment would have

been prohibited by the constitutional provisions aforementioned, it is also clear that the judgment allowing a recovery of such claims is void.

The judgment of the trial court will be reversed, and judgment will here be rendered in favor of the state, and that appellees take nothing by their suit against the State.

### On Motion for Rehearing.

Appellees say that they did not base the state's liability upon a breach of the unauthorized contract of its officers and agents to convey the land, nor upon a mere moral obligation arising from such breach, and the authority of the Legislature to appropriate money in payment thereof. They now claim that the state's liability arises under the common law as assumpsit for money had and received, because the state could not in equity and good conscience retain the price paid and the improvements made on the land after taking the properties back; and that the rule inhibiting officers of the state from incurring debts on its account without previous legal authority does not bar a recovery of their claim. We do not sustain the contention for two reasons, as follows:

■■ 1. The general rule is that: "Where a conveyance executed and delivered is defective, the purchaser's remedy is ordinarily to have it corrected, and he cannot recover the price paid." 66 C. J. 1470. It is only "where the purchaser has a right to rescind the conveyance and has done everything on his part necessary to such rescission," that he can recover the price paid and for improvements made in good faith. 66 C. J. 1506; 29 Tex. Jur. 733. Rescission alone is not sufficient to entitle the purchaser to repayment of the price paid. Such right depends upon the equities of the particular case. Lipscomb v. Fuqua, 103 Tex. 585, 131 S. W. 1061; Miller v. Horn (Tex. Civ. App.) 149 S. W. 769; Bush et al. v. Merrill et al. (Tex. Civ. App.) 156 S. W. 606; Moore v. Giesecke, 76 Tex. 545, 13 S. W. 290; Teas v. McDonald, 13 Tex. 349, 65 Am. Dec. 65; Terrill v. Dewitt, 20 Tex. 257.

■ In the instant case appellees' right to rescind the conveyance was predicated solely upon the fact that two days after the Legislature adopted the resolution authorizing the officers and agents named therein to sell the State Iron Industry, and to provide for its rehabilitation and operation, a general statute was enacted authorizing other officers of the state to appropriate a portion or all of the land in question for asylum purposes.

But after the enactment of this statute, the Legislature from time to time by resolutions specifically recognized the contract and deed in question, and extended the time of their performance, both as to the operation of the plant and the payment of the balance due on the purchase price. Still later the state sued upon the last two unpaid purchase-money notes, thereby recognizing the conveyance, and throughout the proceedings in that suit insisted that the notes were valid, and that the title to the properties had passed by the contract and deed to appellees, or their predecessors in title; and sought title and possession only in the event appellees succeeded in having the conveyance canceled. The state alleged in the former suit that it retained no lien upon the properties, and so recited in the contract and deed; and that its suit was upon the notes and bond given to secure them. Appellees alone insisted that the conveyance was void, and at their suit obtained judgment for cancellation of the deed and the contract and bond, thereby relieving themselves of the contract and bond obligation to rehabilitate and operate the plant for one year as provided. They retained possession of and used the property for about eleven years, collecting the rentals, dismantling and selling parts of the plant, thereby breaching their own contract to rehabilitate and operate the industry. No officer of the state authorized to do so ever demanded possession of the premises, and appellees voluntarily surrendered possession after they obtained judgment declaring the conveyance void. In the former suit appellees asked that the title be perfected, and such a judgment could have been rendered in the state's suit on the notes under the undisputed evidence, and without cost to appellees, if they had tendered the balance due on the purchase price, which they did not do. These undisputed facts bring the case within the aforementioned general rule that, where a conveyance executed and delivered is defective, the purchaser's remedy is to have it corrected, and he cannot recover the price paid where he voluntarily abandons such legal remedy, and insists upon the conveyance being rescinded. And manifestly, under the facts and circumstances of the instant case, appellees did not show that their right to rescind was in accord with any applicable rule or principle of equity, which would entitle them to recover the price paid and for alleged improvements made in good faith.

▉ 2. If it be conceded that the conveyance was void as declared by the former judg-ment, appellees are nevertheless precluded a recovery herein under the rule that money voluntarily paid on a void demand, in absence of fraud and with full knowledge of all facts, cannot be recovered back. Appellees, or their predecessors in title, voluntarily expended all money for improvements, paid all money on purchase price and for taxes on the land conveyed without warranty, without duress, fraud, or imposition, under a mistake of law, or at least with full legal notice of the statute which appropriated the land for asylum purposes; and such moneys cannot be recovered back in any sort of suit, either at law or in equity. Gilliam v. Alford, 69 Tex. 267, 6 S. W. 757; Galveston County v. Gorham, 49 Tex. 279; Austin National Bank v. Sheppard (Tex. Com. App.) 71 S.W. (2d) 242; Corsicana Cotton Mills v. Sheppard (Tex. Com. App.) 71 S.W.(2d) 247. Under this rule of voluntary payment, it is also settled law that where land is conveyed without warranty, absent fraud or imposition of seller, and with full knowledge of all facts, the price paid cannot be recovered, although the conveyance be void. Pitts v. Elsler, 87 Tex. 347, 28 S. W. 518; Taylor v. Hall, 71 Tex. 216, 9 S. W. 141; Cooper v. Singleton, 19 Tex. 267, 70 Am. Dec. 333; Scott v. Slaughter, 35 Tex. Civ. App. 524, 80 S. W. 643, writ refused.

Appellees, or their predecessors in title, purchased the land and expended all money for improvements and paid all money on the purchase price or for taxes, voluntarily and after the enactment of the statutes authorizing other officers of the state to appropriate a part or all of the land in question for asylum purposes. It was a general statute, and of which appellees were required to take notice, under the rule that all persons are charged with notice of statutory law. Moreover, it is the rule that: "The powers of State officers being fixed by law, all persons dealing with such officers are charged with knowledge of the extent of their authority or power to bind the State, and are bound, at their peril, to ascertain whether the contemplated contract is within the power conferred." 59 C. J. 173; Nichols v. State, 11 Tex. Civ. App. 327, 32 S. W. 452, writ refused. So, it is manifest that no equities arose in behalf of appellees in the premises stated. It is also manifest that since all money was voluntarily expended, or paid to the state, no common-law liability could arise against the state. Such is the holding in the recent cases of Austin National Bank v. Sheppard and Corsicana Cotton Mills v. Sheppard, supra.

In the Austin National Bank Case it was held that the common-law liability of the state arose because the unlawful tax or demand was paid under duress and protest. But in the Corsicana Cotton Mills Case it was held that the unlawful tax voluntarily paid could not be recovered, because of the constitutional provision inhibiting the appropriation of money by the Legislature, unless there is already in force a law which makes the claim a legal obligation of the state. The holding in these cases is conclusive of the instant case, because the undisputed facts show that all money sought to be recovered by appellees was voluntarily expended or paid to the state, without fraud or imposition, and with notice of all facts; and therefore no common-law liability could arise against the state.

The motion for rehearing will be overruled.